971 So.2d 1124 (2007)
STATE of Louisiana
v.
Anthony JOHNSON.
No. 2007 KW 0475.
Court of Appeal of Louisiana, First Circuit.
October 10, 2007.
Lewis V. Murray, Assistant District Attorney, Walter Reed, District Attorney, *1125 Franklinton, Louisiana, for Relator, State of Louisiana.
Kathryn Landry, Special Appeals Counsel, Baton Rouge, Louisiana, David Park, New Orleans, Louisiana, Richard Schroeder, New Orleans, Louisiana, for Defendant-Respondent.
Before KUHN, GAIDRY, and WELCH, JJ.
KUHN, J.
This matter is before the court pursuant to an application for supervisory writs filed by the State of Louisiana. In its writ application filed with this Court, the state seeks review of the district court's granting of the defendant's application for postconviction relief and the ordering of a new trial based on DNA test results. In response to the state's writ application, this court issued a writ of certiorari that ordered the parties to file briefs and appear for oral arguments. We further ordered the district court's clerk of court to provide this court with transcripts of the hearing on the application for postconviction relief and of the trial. Following a thorough review of these proceedings, we find merit in the state's writ application.
PROCEDURAL HISTORY:
In 1986, the defendant was found guilty of second-degree murder and sentenced to life in prison. This Court affirmed the conviction and sentence. State v. Johnson, 501 So.2d 1091 (La.App. 1st Cir.1986) (unpublished), writ denied, 504 So.2d 875 (La. 1987).
In 1989, the defendant filed a motion for new trial, asserting that newly discovered evidence showed the victim had a relationship with a convicted murderer, Matthew Brown, and the prosecution was aware of that relationship prior to the defendant's trial. The district court denied the motion in 1990. The defendant filed applications for postconviction relief ("PCR") in 1991 and 1992, alleging ineffective assistance of counsel, insufficient evidence, denial of right to confrontation, and impermissible reference to other-crimes evidence. The district court also denied these PCR applications.
In 2004, the defendant filed the PCR application that is at issue in this writ application, raising two main claims: (1) a request for DNA testing; and (2) a claim that he should be granted a new trial based on the state's failure to disclose exculpatory evidence.[1] With regard to his second claim, the defendant maintained the evidence was newly discovered.[2]
In 2004, the district court granted the defendant's request for DNA testing. The test results revealed that the DNA sample from under the victim's fingernails was from a single male donor and the results excluded the defendant as the donor.
On November 29, 2006, the district court held an evidentiary hearing on the PCR application. The district court took the matter under advisement, and on February 21, 2007, the court granted the PCR, set aside the defendant's "verdict" and ordered a new trial. The district court's ruling was premised on the DNA test results, testimony concerning the transfer of *1126 DNA, and the state's failure to disclose exculpatory evidence.
The state filed a motion for reconsideration of the court's ruling, arguing the court was wrong to grant relief based on the failure to disclose exculpatory evidence because the state had not been given the opportunity to respond to the merits of that claim. The state maintained the exculpatory evidence referred to in the court's ruling was furnished to the defense. The state asked the court to stay its decision pending the outcome of the motion.
The district court denied the request for a stay insofar as the DNA claim was concerned. The court granted the motion for reconsideration insofar as the Brady (exculpatory evidence) claim was concerned and scheduled a hearing regarding the matter.[3] Thus, this Court's review is limited to the district court's determination that the defendant is entitled to a new trial based on the results of the DNA testing. For the reasons that follow, we grant the state's application for supervisory writs.
FACTS:[4]
Sometime between the evening of October 18, and the morning of October 19, 1984, Angela Bond was murdered in the bedroom of her home in Bogalusa, Louisiana. The victim's one-year-old child and her sister's six-month-old child, whom she was babysitting, were with her when she was killed.
About 9:30 a.m. on October 19, 1984, Decrease Bond, the victim's sister, and her boyfriend went to the victim's home to pick up her child. After repeated knocks on the doors, Decrease entered the house through an open kitchen window. Decrease then discovered her sister's body on the floor in her bedroom. The victim was naked and stretched out on her back at the foot of the bed. Two weapons protruded from her body and a large chair lay on top of her, covering her face.
Decrease called the police from a neighbor's home and the officers who arrived at the scene secured several items of evidence, including a shower cap found near the body and a stick used to prop open the kitchen window. The police were unable to lift any fingerprints from the residence, but they subsequently secured other items of evidence, including hair samples, an ice pick, and a two-tined fork.
At approximately 11:00 a.m. on October 19th, the defendant was arrested at his residence. The defendant and the victim were romantically involved at the time of her death, and they had lived together, off and on, for several years. At the time of his arrest, the defendant was wearing pajamas and had a plastic shower cap on his head. Later that day, the defendant voluntarily gave the police the shower cap he was wearing.
While at police headquarters, the defendant recounted his version of the facts to Bogalusa City Police Officer Wayne Kemp. Kemp testified at trial that the defendant told him that at approximately 9:00 p.m. on October 18th, he and the victim had an argument, so he left and went to a nearby bar. The defendant told Kemp that he returned to the victim's home around midnight, but that she had locked the doors and would not let him in. The defendant claimed he then went home. However, according to Kemp, the defendant had special knowledge of the circumstances surrounding the victim's death as he told the officers that he would not have killed her "like that." When Kemp asked the defendant *1127 what he meant by "like that," the defendant told him "with the pick and the fork." Kemp asked the defendant how he knew what weapons were used to kill the victim and he hesitated and then said, "Well, I just figured that's what it was because she slept with them under her pillow all the time." Kemp then asked the defendant how he knew the victim was in the bedroom, and the defendant stated he did not want to talk anymore and that he wanted an attorney.
The autopsy revealed the victim had multiple wounds, including five wounds to the neck (one punctured the jugular vein), an ice pick wound through the breastbone (which punctured the heart), and a fork wound through the abdomen into the liver. According to the pathologist, the latter two wounds required a great deal of force.
Testing revealed the hair samples taken from the plastic shower cap recovered from the scene were similar to the samples taken from the shower cap the defendant was wearing when he was arrested. No fingerprints were found on the ice pick, fork, or other items taken from the house.
Robert Magee, who lived across the street from the victim, testified at trial that he saw the defendant's car at the victim's home at about 1:00 a.m. on October 19th. Carl Magee, a neighbor of the victim, testified that at 6:00 a.m. on October 19th, he saw the defendant drive down the victim's street, blow his horn, and wave.
The defendant testified at trial that on the night of the murder, he went to a bar near the victim's home. At approximately 9:30 p.m., he went to the victim's home to ask her if she wanted some crabs. She told him that she did and at approximately 10:30 p.m., he returned to the victim's home with the crabs. However, at that time, the victim had locked the door, and would not let him in. He claimed she told him he stayed out too late. The defendant returned to the bar, and then returned to the victim's house a few more times throughout the evening, but she refused to let him in her home. The defendant stated that the last time he went to the victim's home was at midnight. When she refused to let him in her house, he returned to the bar, got his car, drove past the victim's home, went to his home, and went to sleep. He maintained that during the entire evening his car was parked at the bar and never parked at the victim's home.
The following morning, he was still in bed when the officers knocked on his door. The officers told him the victim had been killed. He claimed that on the way to the police station, Bogalusa City Police Officer Phillip Collins told him that the victim had been stabbed and that it looked awful. The defendant further testified that Bogalusa City Police Officer Laverne Spikes told him that a fork and an ice pick had been used in the murder. He also stated he knew that the victim slept with a fork and an ice pick for protection. At trial, the defendant subsequently denied telling the officers that he knew the victim slept with an ice pick and fork under her pillow and he claimed the officers were not telling the truth.
On rebuttal, Officer Collins testified that he only told the defendant that the victim had been killed and he did not tell the defendant that she had been stabbed. Additionally, Officer Spikes testified at trial that he did not have a conversation with the defendant. Spikes stated he saw the defendant in lockup, but did not converse with him.
At the close of the state's case-in-chief, a joint stipulation was made that Matthew Brown pled guilty in 1985 to killing two women about five months after the victim *1128 was killed. One of the murders occurred in the same home and same room in which the instant victim was murdered. Joseph Rogers testified as a witness for the defense, and he claimed that while in jail, Brown told him that he had murdered three women. Brown indicated to him that another man was serving time for the last girl that Brown killed. Rogers indicated that Brown told him he dumped that victim's body by the airport. Bogalusa City Police Officer Mike Edwards testified he interviewed Brown several months after the victim was murdered. Brown denied killing the victim in the instant case and stated that he was out of town during that time.
THE STATE'S CONTENTION:
In its application filed with this Court, the state urges the district court improperly granted the defendant's application for PCR and new trial based on the DNA test results. The state contends that La.Code Crim. P. art. 930.3(7) mandates that in order for relief to be granted, the results of the DNA testing performed pursuant to La.Code Crim. P. art. 926.1 must prove by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted. The state argues the defendant failed to meet this burden of proof. The state acknowledges that the DNA test results of the victim's fingernail scrapings excluded the defendant as a donor of that sample. The state points out, however, that during the hearing on this matter, there was expert testimony that DNA from another person could be transferred to the fingernails through contact other than a struggle. The state points out that there was trial testimony that at least one of the children at the victim's home on the night of the instant crime was male. Thus, the state contends the DNA tests results from the victim's fingernail scrapings did not prove by clear and convincing evidence that the defendant was factually innocent of the crime as required by article 930.3(7).
THE DEFENDANT'S REPLY:
In his reply to the state's writ application, the defendant contends that his exclusion as the male donor of the DNA found under the victim's fingernails was sufficient to meet the burden of proof set forth under La.Code Crim. P. art. 930.3(7). The defendant sets forth that evidence presented at trial showed the victim died after a violent struggle with her assailant. The defendant argues that the case against him was purely circumstantial. He sets forth that the only evidence against him was his incriminating statement made regarding the unusual circumstances of the crime and witness testimony regarding his presence at the victim's home around the time of the crime.
The defendant attempts to downplay the significance of his statement to the police by noting that the statement was not recorded and not put into a report until two months after the crime occurred. He also sets forth that conflicting explanations were given as to why the statement was not taped. The defendant further contends the neighbor, who testified he saw the defendant leaving the victim's house, might have seen him the day before the victim died because the neighbor testified he was taking his trash out, and garbage was collected on the day before the victim was found dead.[5]
The defendant further contends there is strong evidence that other individuals committed the crime. The defendant sets *1129 forth that another man, Matthew Brown, committed similar crimes in the same area, including one in the same house where the instant victim lived. The defendant also asserts that Kelvin Hayes made statements indicating he may have committed the murder.
Furthermore, the defendant argues there is a high probability that the victim was killed after a violent struggle. He references Dr. Sudhir Sinha's testimony at the PCR hearing regarding studies finding that biological material under the fingernails most likely results from intimate contact such as a struggle rather than from casual contact. The defendant claims that the state "tries to muddy the waters" by making an issue of the possibility of a male child being present in the victim's home at the time the crime occurred who possibly could have been the source of the DNA. The defendant asserts, however, that the testimony at the PCR hearing indicated that the children were female and notes the district court made this same finding after reviewing the entire record.
DISTRICT COURT'S RULING ON THE PCR:
In setting forth its reasons for granting the defendant's PCR application, the district court noted that at the time of his arrest, the defendant's body showed no evidence of bruising, swelling, cuts, or other indicia of a struggle, and no evidence relating to the murder was found in his apartment. The court also stated that a knife or other flat-bladed object was used to make five stab incisions on the left front side of the victim's neck, one of which slashed the jugular vein. The court noted that that injury alone could have been the cause of death after a few minutes. Additionally, the court stated that an ice pick was thrust through the victim's chest and pierced her heart, and a two-pronged fork pierced her abdomen extending into her liver and inferior vena cava. The court concluded that although either of these wounds could also have killed the victim, the greatest blood loss and the first injury came from the knife wound to the neck. The court further noted that a detective testified at trial that nothing was returned from the crime lab regarding the fingernail clippings and no foreign matter was found on the clippings.
The court stated that Dr. Sinha testified at the PCR hearing that DNA does not make its way to another's fingernails from casual contact, the most likely source is someone with whom the victim has had intimate contact, and DNA analysis of fingernail scrapings is particularly useful in cases where a struggle is involved.
Relying on the following, the district court determined the defendant proved by clear and convincing evidence that he was factually innocent of the victim's murder: (1) the circumstantial evidence introduced at trial was of a "very tenuous nature"; (2) the testimony at trial was that there was no foreign matter under the victim's fingernails; (3) the subsequent determination that DNA found under the victim's fingernail was of a single male "lineage" that excluded defendant; and (4) the credible expert testimony at the PCR hearing regarding the likelihood of DNA transfer in a struggle and the implausibility of DNA transfer through casual contact. The court concluded the defendant was entitled to a new trial, and the state filed its writ application.[6]
LAW:
In 2001, the Louisiana Legislature established a procedure for a felon to request *1130 DNA testing. 2001 La. Acts No. 1020, § 1. One of the listed grounds for a PCR is that the "results of DNA testing performed pursuant to an application granted under Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted." La.Code Crim. P. art. 930.3(7).
In State v. Robertson, 42,247 (La.App.2d Cir.6/25/07), 958 So.2d 787, the defendant had been convicted of rape, and pursuant to La.Code Crim. P. art. 926.1, he petitioned for DNA testing of certain evidentiary items used to convict. The district court denied his motion for DNA testing. In reviewing this ruling, the Second Circuit found that the defendant's claim that DNA testing would establish he was the attacker was an "alternative and inconsistent" theory of defense to the one he had offered at trial. It further reasoned, "The DNA testing statute appears to be directed toward freeing the innocent, and not toward a reweighing of the evidence used to convict." State v. Robertson, 42,247, at p. 1, 958 So.2d at 788. The Second Circuit determined that the district court did not err in denying the motion because the "[DNA] testing, even if it had been resolved in favor of the [defendant], . . . would not have established his innocence of the crimes of which he was convicted." The court also stated that the DNA testing statute is an "extraordinary post-conviction remedy designed to free the innocent, and it is not an alternative form of motion for new trial based on newly discovered evidence." State v. Robertson, 42, 247, at p. 1, 958 So.2d at 788.
Additionally, we note courts in other jurisdictions have determined that the absence of a defendant's DNA from the victim's fingernail scrapings or clippings did not provide proof of actual innocence. See Leonard v. Dretke, 2005 WL 3543348, p. 8 (N.D.Tex.2005); Com. v. Smith, 889 A.2d 582, 585 (Pa.Super.Ct.2005), appeal denied, 588 Pa. 769, 905 A.2d 500 (2006); Rivera v. State, 89 S.W.3d 55, 60 (Tex.Crim.App. 2002); and People v. Savory 309 Ill.App.3d 408, 242 Ill.Dec. 731, 722 N.E.2d 220, 226 (1999), affirmed, 197 Ill.2d 203, 258 Ill. Dec. 530, 756 N.E.2d 804 (2001).
DISCUSSION:
Because the district court agreed to reconsider its ruling insofar as the Brady claim is concerned and a hearing is scheduled for that claim, the instant writ application is limited to review of the district court's ruling that the defendant proved with the DNA evidence that he is factually innocent of the instant offense. In its ruling, the district court specifically relied on the testimony of Dr. Sinha, noting the "likelihood of DNA transfer in a struggle, and the implausibility of DNA transfer through casual contact."
Dr. Sinha, an expert in DNA testing, testified, over the objection of the state, regarding articles from scientific journals concerning the transfer of DNA to the fingernails and fingernail scrapings. According to Dr. Sinha, his experience was not inconsistent with the views expressed in the journal articles, which indicated that the most likely source of DNA under the fingernails is an individual with whom the donor has had intimate contact. However, Dr. Sinha also indicated that a small amount of DNA could be transferred from casual contact. Dr. Sinha also admitted that DNA from fingernail scrapings could be tracked from a mother to a child.
Dr. Huma Nasir, an expert in DNA analysis, testified at the PCR hearing that the scrapings from the victim's fingernails were tested and that the defendant could be excluded as a donor for the DNA found from the victim's fingernail scrapings. However, Dr. Nasir testified that he did not know the source of the DNA. Dr. *1131 Nasir stated that in order to determine if the samples were consistent with the DNA of the victim's son, the samples would have to be tested again.
During the PCR hearing, the issue was raised as to the sex of the children present in the victim's home on the night of the crime. Both the state and the defendant argued as to whether the children were girls or boys, but nothing definitive regarding this issue was established at the PCR hearing. The district court stated that the sex of the children was irrelevant in 1986, when DNA was not an issue, but that it has tremendous relevance in light of the new DNA evidence. Although the trial transcript clearly indicates that there was at least one male child in the house, the district court concluded that based on items submitted at the PCR hearing, the children present at the crime scene were girls and not boys. At the PCR hearing, the defendant's sister testified that the children at the victim's home on the night in question were girls.
During the trial in 1986, however, the victim's sister, Decrease, specifically testified that the victim was babysitting her little boy. Decrease also generally referenced the victim's son as being one year old at the time of the victim's death. In his response to the state's application, the defendant failed to explain the trial testimony, which referenced the children as males, other than to say that the victim's sister, Decrease, was simply mistaken.
Dr. Michael Haas, an expert in emergency medicine, testified at the PCR hearing that upon reviewing the coroner's report and other evidence, he felt that there had been a violent struggle between the victim and her attacker. Although Dr. Haas opined violent activity had occurred at the time of the victim's death, he stated he could not testify as to whether the victim had resisted the attack.
While Dr. Sinha testified at the PCR hearing that fingernail scrapings can be useful in cases involving a struggle, he also indicated that DNA could be transferred by contact not involving a struggle. In the instant case, there was no proof of a struggle by the victim with her assailant. Although the victim apparently sustained bruises to the head and knife wounds to the neck, there is no testimony regarding defensive-type wounds to the victim. Also, trial testimony established that when defendant was arrested he did not appear to have any defensive-type wounds or indications that he was involved in a struggle.
At the defendant's trial, there was testimony that the testing of the victim's fingernail clippings produced negative results, indicating no foreign matter was found on them. However, the DNA in question, found later through more advanced testing, could have been transferred to the victim's fingernails at any time prior to her murder. The defendant's argument and the court's ruling appear to rely on an assumption for which there is no evidence in the record, i.e., that the victim struggled or fought with her assailant, thereby acquiring his DNA under her fingernails. There is no evidence presented to show that the DNA detected on the victim's fingernail scrapings was deposited by the assailant during the attack.
In the instant case, the mere detection of DNA from another male on the victim's fingernails, absent any evidence as to how and when the DNA was deposited, does not show by clear and convincing evidence that the defendant was factually innocent of the instant crime. The mere showing of DNA belonging to an unknown male on the victim's fingernail scrapings does not exonerate the defendant in the instant case but would "merely muddy the waters." See Rivera v. State, 89 S.W.3d at *1132 59. There is no showing in the instant case that only the assailant's DNA would have been found under the victim's fingernails, as there are numerous methods in which another male's DNA could have been transferred to the victim's fingernails.
The defendant placed himself at the scene of the crime, he told the police the unusual circumstances of the murder, and the police testified they had not told him about these circumstances of the crime. One neighbor testified that he saw the defendant's car at the victim's home on the night in question after the defendant claimed he went home and another neighbor saw him driving down the victim's street early on the morning the victim's body was found.
Considering the above, we conclude that the results of this DNA testing did not prove by clear and convincing evidence that the defendant is factually innocent of the crime for which he was convicted. Therefore, we find that the district court abused its discretion in granting the defendant's PCR application and ordering a new trial based on the finding that the DNA evidence found under the victim's fingernails did not match the defendant's DNA.
For these reasons, the state's application for supervisory writs is granted. That portion of the district court's February 21, 2007 ruling granting the defendant's PCR application based on La.Code Crim. P. art. 930.3(7) is reversed; that portion of the ruling setting aside the defendant's "verdict" and ordering a new trial on that ground is vacated.
WRIT OF CERTIORARI RECALLED. WRIT GRANTED AND MADE PEREMPTORY.
WELCH JR., dissents with reasons.
WELCH, J., Dissenting.
The only issue in this case is whether the DNA test results, which excluded the petitioner as a contributor of DNA found under the victim's fingernails, under all of the circumstances of this case, constitutes clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted. I believe the majority errs by placing too stringent a burden on the petitioner to virtually demonstrate that the test results would exonerate or completely vindicate him of the murder charge in order to obtain a new trial. Therefore, I respectfully dissent.
Louisiana Code of Criminal Procedure article 930.3(7) permits a petitioner to obtain a new trial upon showing that results of DNA testing performed pursuant to La.C.Cr.P. art. 926.1 "proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted." In discussing the burden of proof required by La.C.Cr.P. art. 930.3(7), the majority cites a second circuit case wherein the appellate court found that a trial court did not err in denying a motion for DNA testing because the testing would not have established the defendant's innocence. State v. Robertson, 42,247 (La.App. 2nd Cir.6/25/07), 958 So.2d 787. That case, however, has no bearing on the issue of the burden of proof required under La.C.Cr.P. art. 930.3(7). The only issue in Robertson was whether the petitioner had met the threshold showing necessary to obtain DNA testing. Under La.C.Cr.P. art. 926.1, testing is permitted only in those cases in which (1) there is a factual explanation of why there is an "articulable doubt" as to guilt and (2) the testing "will resolve the doubt and establish the innocence of the petitioner." In Robertson, the applicant for DNA testing was convicted of rape. His victim identified him in two lineups and in open court, *1133 and his prints were found at the point of entry on a window opening to the victim's home. On appeal, the applicant did not contest the sufficiency of evidence on the issue of identity, but rather, the degree of force used and proof that the offender was armed. Thereafter, the applicant sought DNA testing on evidentiary items used to convict him, asserting that the DNA testing would establish he was not the attacker. In upholding the lower court's denial of DNA testing, the court of appeal noted that the applicant was asserting an alternative and inconsistent theory of the defense to the one he offered at trial, which was prohibited by Supreme Court jurisprudence. Also, the court found that the DNA testing, even if resolved in the applicant's favor, would not "establish his innocence" of the crime for which he was convicted. Any statements the court made in that case as to the burden of proof under La. C.Cr.P. art. 930.3(7) are purely dicta, as that provision was never at issue.
The majority then cites cases requiring proof of "actual innocence" in discounting the value of a DNA exclusion result from fingernail scrapings. However, none of these cases involved a "clear and convincing" standard of proof, as does La.C.Cr.P. art. 930.3(7), and none of these cases are even remotely similar to the case at hand.
The "actual innocence" standard cited by the majority is employed by federal courts to determine whether a petitioner may pursue habeas corpus relief in federal court based on constitutional claims that are procedurally barred under state law. House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 2068, 165 L.Ed.2d 1 (2006). Federal courts have held that prisoners asserting innocence as a "gateway" to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. Id.
The first case relied on in support of the proposition that the absence of a defendant's DNA from the victim's fingernail scrapings or clippings does not provide proof of "actual innocence," Leonard v. Dretke, 2005 WL 3543348, p. 8 (N.D.Tex. 2005), involved a habeas corpus challenge to a petitioner's murder conviction, in which the petitioner sought to raise an ineffective assistance of counsel claim in federal court that was not raised in state court. As a procedural matter, the claim could only be raised upon showing that the failure to consider the claim would result in a fundamental miscarriage of justice, which is confined to cases of "actual innocence." Id. The petitioner asserted that DNA testing would reveal that his skin was not found under the victim's fingernails, and thus would ultimately prove his claim of innocence. The court concluded the evidence was insufficient to overcome the procedural bar, observing that the DNA results even if favorable, would not "exonerate" the petitioner.
In People v. Savory, 309 Ill.App.3d 408, 242 Ill.Dec. 731, 722 N.E.2d 220, 226 (1999), affirmed, 197 Ill.2d 203, 258 Ill.Dec. 530, 756 N.E.2d 804 (2001), an appellate court was divided over how to interpret a DNA testing statute which required an applicant to demonstrate, in order to obtain DNA testing, that the result of the test would be "materially relevant to the defendant's assertion of actual innocence." The majority equated the term "actual innocence" with "total vindication," and read the provision to limit the scope of the statute to only that DNA evidence that had the potential to exonerate a defendant. Two judges dissented, believing that by using the term "actual innocence" the legislature did not intend to limit the use of scientific testing to only those situations *1134 where it would result in the total vindication or would exonerate the defendant.
Unlike the instant case, in the cited cases where the courts have found DNA fingernail scraping exclusion evidence would not exonerate the defendant, there was overwhelming evidence of the defendant's guilt. For instance, in Rivera v. State of Texas, 89 S.W.3d 55, 60 (Tex. Crim.App.2002), the defendant was convicted of capital murder in the course of an aggravated sexual assault of a child. The defendant gave a videotaped oral confession to the crime in which he admitted strangling the child and sexually assaulting her. In the course of the confession, the defendant gave numerous details of the murder, including where the body had been left, that were later corroborated in the investigation. Following his conviction, the defendant sought to have DNA testing done on his own fingernail clippings, supposedly taken from him during the murder investigation, claiming that the absence of the child's DNA from his fingernail clippings would prove his innocence. The court disagreed, finding that the defendant failed to show that favorable DNA results would prove his innocence. The court questioned whether the evidence even existed, and concluded that even if a negative test resulted in a weak exculpatory inference, such an inference could not come close to outweighing the defendant's confession.
Similarly, in the case of Commonwealth v. Smith, 889 A.2d 582, 585 (Pa.Super.Ct.2005), appeal denied, 588 Pa. 769, 905 A.2d 500 (2006), there was overwhelming evidence of a defendant's guilt for first-degree murder. In that case, the victim had 35 stab wounds, and the defendant was apprehended a few hours after the victim's body was found carrying a knife stained with blood matching the victim's blood type, and wearing clothes with blood stains linked to the victim. The court concluded that there was no "reasonable probability" the DNA testing of a victim's fingernail clippings would establish the defendant's actual innocence in light of the overwhelming evidence the defendant committed the crime. Moreover, the court noted, the defendant failed to provide an evidentiary basis from which to infer that DNA on the victim's fingernails were deposited there by her assailant.
To the contrary, in this case, the petitioner did provide an evidentiary basis upon which the trial court could infer that DNA on the victim's fingernails was deposited there by her assailant. First, the petitioner presented testimony that Angela Bonds struggled with her assailant. Captain Wayne Kemp, who investigated the murder, attested it was not the type of situation where an assailant walked in the victim's home, stabbed her, and she "fell over dead." Instead, Captain Kemp stated, this murder involved a "fight." Additionally, the autopsy report showed that the victim had bruises and contusions on the right and left sides of her forehead where she had been struck with a blunt object.
Secondly, the petitioner offered evidence showing the significance of DNA evidence found in fingernail scrapings. At the evidentiary hearing, Dr. Sudhir Sinha, an expert in DNA testing, attested that in cases involving a struggle between a victim and an offender, fingernail clippings are a very useful identification tool. Dr. Sinha was questioned regarding numerous studies conducted in connection with DNA fingernail scraping evidence. He concurred in one report suggesting that when foreign DNA is present under fingernails, the most likely source of the DNA is an individual with whom the donor has had intimate contact. Dr. Sinha also stated that there were several studies supporting the *1135 conclusion that in a casual contact, only a "very, very, very small" amount of DNA had been transferred, in the range of eight to ten percent. Dr. Sinha admitted that it is widely known that contact DNA does produce DNA in the fingernail, but stated it is "very low." Dr. Sinha acknowledged that in one or two instances, DNA had been transferred by intimate contact with a family member, such as mother to child's DNA in the mother's fingernail.
The State submits that because the trial evidence shows that there were two male children in the Bonds' home on the night of her murder, the DNA under the victim's fingernails may have belonged to one of them. However, the petitioner offered evidence at his hearing to establish that both of the children at the victim's home that evening were in fact female. In ruling on the motion for post-conviction relief, the court made a factual finding that there were two female children in the home, and that finding is supported by the record.
Thus, the petitioner presented evidence establishing that: (1) the victim died after a struggle with her assailant; (2) when DNA is found under fingernail scrapings, it most likely came from an intimate contact with the donor; (3) the DNA under the victim's fingernails was of a single male lineage; and (4) the DNA excluded the petitioner as the source of the DNA under the victim's fingernails. As the trial court correctly observed, this evidence created the inference that it is probable that the biological material from the fingernail scrapings was deposited there by Angela Bonds' killer, and the DNA evidence excluded petitioner as the source of the DNA.
Louisiana Code of Criminal Procedure article 930.3(7) employs a "clear and convincing" standard by which to measure the DNA test results. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, more probable than its nonexistence. Fernandez v. Hebert, XXXX-XXXX, p. 9 (La.App. 1st Cir.5/4/07), 961 So.2d 404, 408. To sustain his burden of proof under La.C.Cr.P. art. 930.3(7), a petitioner must demonstrate that the test results make it highly probable that he did not commit the crime for which he has been convicted. The petitioner is not required to demonstrate that the DNA tests, standing alone, constitute conclusive exculpatory evidence. Louisiana Code of Criminal Procedure article 930.3(7) does not require a demonstration that the test results exonerate a petitioner or establish his "actual innocence" as that term is utilized in the jurisprudence. Nor is there a requirement that the DNA evidence be considered in light of only the incriminating evidence adduced at the petitioner's trial, as the majority did in this case.
Instead, I believe that the resolution of whether the DNA results provide clear and convincing evidence of a petitioner's factual innocence can only be made by conducting a fact-intensive inquiry, during which a court should consider all evidence, both incriminating and exculpatory, in determining whether the petitioner met his burden of proof under the statute. The trial court conducted the type of fact-intensive inquiry envisioned by La.C.Cr.P. art. 930.3(7).
As the trial court correctly observed, the State's case against petitioner was entirely circumstantial. Moreover, there was evidence presented at trial and in the application for post-conviction relief implicating two other individuals in the murder. Considering all of the circumstances of this case, particularly the absence of any physical evidence against linking petitioner to the murder, the presence of evidence implicating *1136 two other individuals in the murder, the probability that the biological material from the fingernail scrapings came from the killer, and the exclusion of petitioner as a source of the DNA found under the victim's fingernails, the DNA tests results create a strong exculpatory inference, making it "highly probable" that the defendant is innocent of the crime of murder. Therefore, the trial court correctly found that the petitioner met the burden of proof under La.C.Cr.P. art. 930.3(7), and I would deny the State's writ application.
NOTES
[1] The PCR also contained six additional claims that are not presently at issue before this Court.
[2] The state concedes that insofar as the defendant requested DNA testing, the PCR was filed timely under La.Code Crim. P. art. 926.1(A)(1). At the time the defendant filed his PCR in 2004, the deadline for filing a PCR under Article 926.1 was August 31, 2007. See La.Code Crim. P. art. 926.1(A)(1) (as amended by 2003 La. Acts No. 823, § 1, but prior to its amendment by 2006 La. Acts No. 120, § 1.
[3] The status of that claim is not evident based on the record presently before this Court.
[4] The facts in this opinion were derived from this Court's appellate opinion and the defendant's trial transcript.
[5] As part of the Brady claim asserted in his PCR application, the defendant claimed that it was not until after trial that he learned that this witness, who claimed to have seen him leaving the victim's home, saw him while the witness was taking out the trash.
[6] The district court also determined the defendant was entitled to a new trial based on the state's failure to disclose exculpatory evidence and set forth extensive reasons regarding that determination, the subject of which is not now before this Court.