Docket No. 88786–Agenda 12–September 2000.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHNNY LEE SAVORY, Appellant.

Opinion filed May 24, 2001.

JUSTICE McMORROW delivered the opinion of the court:

The defendant, Johnny Lee Savory, filed a motion in the circuit court of Peoria County pursuant to section 116–3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116–3 (West 1998)), in which he sought to obtain scientific testing of certain evidence introduced at his murder trial 20 years ago. The circuit court denied defendant’s motion, and the appellate court affirmed. 309 Ill. App. 3d 408. For the reasons that follow, we affirm the judgment of the appellate court.

BACKGROUND

The offenses for which defendant was convicted occurred in Peoria on January 18, 1977. The victims, Connie Cooper, 19 years old, and her brother, James Robinson, 14 years old, were found murdered in their home. They had been stabbed repeatedly, and there were no signs of forced entry to the residence. Defendant, also 14, was a friend of James and was known to have been at the house the night before the offenses. Defendant was questioned by police a week after the victims’ bodies were discovered. After making several exculpatory statements concerning his activities on January 17 and 18, 1977, defendant eventually confessed to the crimes.

Defendant was convicted of the two murders following a jury trial in 1977. On appeal, the appellate court concluded that defendant’s confession was inadmissible and reversed the convictions. 
People v. Savory
, 82 Ill. App. 3d 767 (1980). The cause was remanded for a new trial, which was conducted in 1981, following a change of venue to Lake County.

At defendant’s second trial, the State introduced evidence of certain admissions made by defendant to several of his friends on the day of the offenses. One of these friends, Ella Ivy, testified that defendant made inculpatory statements before 4:30 p.m., the time the victims’ bodies were discovered. Ella stated that, at approximately 2:30 p.m. on January 18, defendant told her that he and James Robinson had been playing karate and that he had accidentally cut James. Ella also testified that she saw defendant again a little more than an hour later, around 4 p.m., and that he told her that Robinson and his sister were dead. That night, defendant told Ella that he was planning to take flowers to the victims’ mother, and Ella saw a knife fall out of defendant’s wallet.

Ella’s brother, Frankie Ivy, testified that, at approximately 8 p.m. on January 18, defendant said that he had accidentally stabbed James Robinson and his sister.

Tina Ivy, sister of Ella and Frankie, testified that, at approximately 7 p.m. on January 18, defendant told her that “two kids had got killed.” Defendant also told her that he and Robinson had been practicing karate earlier that day and that he had accidentally cut Robinson. Tina further testified about a conversation she had with defendant the day after the murders, on January 19. On that occasion, defendant told her that whoever committed the offenses must have known the victims, because the family dog, a German shepherd, would not have allowed a stranger in the house. Defendant also told Tina that the victims had been brutally stabbed.

At the second trial, the State also introduced evidence of statements that defendant made to police prior to making his inadmissible confession. In these statements, defendant said that, on January 17, the night before the victims were killed, he and James had prepared cooked corn and hot dogs in the kitchen and had played karate games in the living room. Defendant also said that they had moved the television set to the floor so that it would not get knocked over during their play. The State argued that the contents of these statements revealed a knowledge of the crime scene that only the offender would have had, and that what defendant said occurred on the evening of January 17 actually took place on January 18 and resulted in the deaths of the two victims. The State supported this argument with testimony from the victims’ mother and stepfather. This testimony showed that James and the defendant had not eaten anything during the defendant’s visit on the evening of January 17. The testimony also showed that, when the victims’ mother and stepfather left for work on the morning of January 18, the kitchen was clean and the television set was in its customary place on a stand. The victims’ mother further stated that she prepared corn and hot dogs for the children that morning and left the food on the stove for them. The parents returned home at approximately 4:30 p.m. and discovered the victims’ bodies. At that time, the kitchen was in disarray and the television set was on the living room floor.

The State also presented physical evidence connecting defendant to the offenses, including evidence that hairs consistent with defendant’s were found in the bathroom sink and tub, that a knife from defendant’s home had blood on it, and that a bloodstain found on a pair of trousers recovered from the defendant’s home was of the same blood type as Connie Cooper’s.

Defendant presented evidence of an alibi and also attempted to show that the victims’ stepfather and former boyfriends of Connie might have committed the crimes. Regarding the bloodstained trousers, defendant’s father testified that they belonged to him, and that the bloodstain was from a cut he had received on his leg.

At the conclusion of the second trial, a jury again found defendant guilty of the murders of Connie Cooper and James Robinson. The trial judge later sentenced defendant to concurrent, indeterminate sentences of 40 to 80 years’ imprisonment for the two offenses. Defendant’s convictions and sentences were affirmed on appeal. 
People v. Savory
, 105 Ill. App. 3d 1023 (1982). Defendant’s subsequent post-conviction petitions, which included his claim that Tina and Frankie had purportedly recanted their testimony, were denied. His request for 
habeas corpus
 relief was also denied. No. 3–84–0008 (unpublished order under Supreme Court Rule 23); No. 3–90–0059 (unpublished order under Supreme Court Rule 23); 
Savory v. Lane
, 832 F.2d 1011 (7th Cir. 1987).

Defendant initiated the present proceeding in 1998 by filing a motion in the circuit court of Peoria County pursuant to section 116–3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116–3 (West 1998)). Section 116–3 allows a defendant to have physical evidence subjected to scientific testing that was not available at the time of trial if certain requirements are met. To obtain testing, a defendant must present a 
prima facie
 case that identity was the issue at his trial and that the evidence to be tested has been under a secure chain of custody. Testing is permitted if, among other requirements, “the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence.” 725 ILCS 5/116–3(c)(1) (West 1998).

In the present case, defendant’s motion requested that DNA testing be performed on the bloodstained trousers that the State contended defendant had been wearing at the time of the offenses. Defendant maintained that he is innocent of the murders. He alleged that the test results would show that the blood did not match that of Connie Cooper, and would thus eliminate one of the pieces of physical evidence introduced by the State at trial. The motion also requested testing of material found under Connie Cooper’s fingernails
(footnote: 1)
 After a hearing, the circuit court denied defendant’s motion. With respect to the bloodstained trousers, the court concluded that defendant had satisfied the first two requirements of the statute, namely, that identity was the issue at his trial, and that the evidence had been subject to a sufficient chain of custody. The court determined, however, that the test results would not be materially relevant to defendant’s assertion of actual innocence. After reviewing the transcript of defendant’s second trial, as well as the various opinions rendered in the different proceedings, the judge concluded that, even if DNA testing of the blood on the trousers showed that it was not Connie Cooper’s, that evidence would not significantly affect the State’s case. Therefore, the blood evidence was not materially relevant to defendant’s claim of actual innocence.

With one justice dissenting, the appellate court affirmed the circuit court judgment, though on different grounds. 309 Ill. App. 3d 408. The appellate court concluded that the remedy provided by section 116–3 of the Code of Criminal Procedure is available only in cases where the proposed scientific testing will, by itself, completely vindicate a defendant. The appellate court determined that in this case, even a test result favorable to defendant could not completely vindicate him, because a favorable test result would still be consistent with a conclusion of guilt.

The dissenting justice disagreed with the majority’s interpretation of the statute, finding it too narrow. 309 Ill. App. 3d at 416-17 (Holdridge, P.J., dissenting).

We allowed defendant’s petition for leave to appeal. 177 Ill. 2d R. 315(a).

ANALYSIS

As a preliminary matter, the State argues that this court does not have jurisdiction over the present appeal. The State contends that there is no avenue of appeal for a defendant from an adverse ruling on a motion for testing under section 116–3. We disagree.

Article VI, section 6, of the Illinois Constitution provides, in pertinent part:

“Appeals from final judgments of a Circuit Court are a matter of right to the Appellate Court in the Judicial District in which the Circuit Court is located except in cases appealable directly to the Supreme Court ***. The Supreme Court may provide by rule for appeals to the Appellate Court from other than final judgments of  Circuit Courts.” Ill. Const. 1970, art. VI, §6.

Supreme Court Rule 603 provides:

“Appeals in criminal cases in which a statute of the United States or of this State has been held invalid and appeals by defendants from judgments of the circuit courts imposing sentence of death shall lie directly to the Supreme Court as a matter of right. All other appeals in criminal cases shall be taken to the Appellate Court.” 134 Ill. 2d R. 603.

Supreme Court Rule 2(b)(2) states that the term “ ‘[j]udgment’ also includes decree, determination, decision, order, or portion thereof.” 134 Ill. 2d R. 2(b)(2). An order of the circuit court denying a defendant’s motion for testing pursuant to section 116–3 of the Code of Criminal Procedure disposes of the defendant’s request for relief under that provision. The motion seeks to initiate a separate proceeding, independent of any claim for post-conviction or other relief. Thus, denial of a motion requesting relief under section 116–3 is a judgment–or decree, determination, decision, or order, as our Rule 2(b)(2) provides–that finally disposes of the defendant’s claim. Thus, the denial of defendant’s motion by the circuit court in the present case was a final judgment, and the appellate court possessed jurisdiction over the defendant’s appeal from the adverse ruling.

We now turn to the merits of defendant’s appeal. Defendant contends that the appellate and circuit courts erred in denying his motion for scientific testing pursuant to section 116–3 of the Code of Criminal Procedure of 1963. 725 ILCS 5/116–3 (West 1998). Defendant maintains that he fulfilled the prerequisites of the statute and that the present cause should therefore be remanded so that the bloodstain on the trousers can be subjected to DNA testing.

Section 116–3 of the Code of Criminal Procedure of 1963 provides:

“(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of trial. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State’s interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community.” 725 ILCS 5/116–3 (West 1998).

The appellate court determined that forensic testing under section 116–3 should be permitted only when a result favorable to the defendant will, by itself, vindicate the defendant. Defendant argues that the appellate court’s interpretation of section 116–3 incorrectly restricts the operation of the statute. According to defendant, the phrase “the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence” shows that section 116–3 does not limit testing to cases in which a result favorable to the defense will, by itself, vindicate the defendant who is requesting the test. Defendant further contends that, under the appellate court’s interpretation of section 116–3, the statute can be used only in cases in which a lone offender leaves blood, semen or other physical evidence at the scene, because only in those cases would a test result of the physical evidence that was favorable to the defense result in complete vindication of the defendant. According to defendant, if the case involved multiple defendants, or if it was claimed, as in this case, that evidence from the victim was left on the defendant, then testing could not completely exonerate the defendant. Defendant contends that such a limited application of the statute is improper.

The cardinal principle of statutory construction is to ascertain and give effect to the intention of the legislature. 
People v. Pullen
, 192 Ill. 2d 36, 42 (2000);
 Michigan Avenue National Bank v. County of Cook
, 191 Ill. 2d 493, 503-04 (2000). The language used by the legislature is the best indicator of legislative intent, and thus our inquiry appropriately begins with the statutory text.
 In re D.L.
, 191 Ill. 2d 1, 9 (2000); 
Business & Professional People for the Public Interest v. Illinois Commerce Comm’n
, 146 Ill. 2d 175, 207 (1991). The statutory language must be given its plain and ordinary meaning, and when the terms used by the legislature are clear and unambiguous, it is not necessary to resort to other aids of construction. 
Michigan Avenue National Bank
, 191 Ill. 2d at 504; 
Henry v. St. John’s Hospital
, 138 Ill. 2d 533, 541 (1990). We conclude that an examination of the language in section 116–3 reveals that it does not contain the restriction the appellate court imposed on it.

At issue here is the requirement of section 116–3(c)(1) that “the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence.” Relevant evidence is “[e]vidence tending to prove or disprove a matter in issue.” Black’s Law Dictionary 579 (7th ed. 1999). The term “materially” modifies the term “relevant” and means “to a significant extent or degree.” Webster’s Third New International Dictionary 1392 (1993). Thus, evidence which is “materially relevant” to a defendant’s claim of actual innocence is simply evidence which tends to significantly advance that claim. The language used by the legislature in section 116–3 does not support the appellate court’s restrictive interpretation of the statutory requirements. As our appellate court has noted in other cases involving section 116–3, if the legislature had intended to limit application of the statute to the instances in which a test result favorable to the defendant would, standing alone, lead to his complete vindication, it would have chosen a different way of expressing the statutory requirements. See 
People v. Hockenberry
, 316 Ill. App. 3d 752, 758-59 (2000); 
People v. Rokita
, 316 Ill. App. 3d 292, 301-02 (2000).

The State contends, however, that its proposed interpretation of the statute, limiting the statute’s scope to tests that would completely vindicate the defendant seeking them, is consistent with the legislative history of the provision. The State points to comments made by one of the legislation’s sponsors during debates on the bill that eventually became section 116–3. Discussing the requirements of the statute, one senator explained, “The testing will then be–will then be ordered if–if the evidence would basically result in the person being absolutely acquitted of the evidence [
sic
].” 90th Ill. Gen. Assem., Senate Proceedings, May 9, 1997, at 106-07 (statements of Senator Petka). While we agree that testing is available in the circumstances referred to by the senator, we cannot agree that the language used by the legislature limits the availability of the special remedy found in section 116–3 to those circumstances. As we have noted, the language of the statute does not support such a restricted interpretation. Accordingly, we hold that section 116–3 is not limited to situations in which scientific testing of a certain piece of evidence would completely exonerate a defendant.

It remains for us to decide whether the evidence at issue in this case is “materially relevant to the defendant’s assertion of actual innocence,” as section 116–3 requires. That question cannot be determined in the abstract. Rather, it requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test.

We hold that the evidence defendant seeks to test is not “materially relevant” to his claim of actual innocence. We have carefully reviewed the transcript of defendant’s second trial, conducted in 1981, which resulted in the convictions he now challenges. Our examination of the record shows that the testimony regarding the possible source of the bloodstain on the pair of trousers was only a minor part of the State’s evidence in this case. A far greater portion of the State’s case consisted of defendant’s knowledge of certain features of the crime scene, such as the type of food prepared in the kitchen that day and the placement of the television set, which only the offender could have known, and of defendant’s statements to Ella, Frankie, and Tina Ivy that he had been at the victims’ home the day of the murders and had cut one or both of the victims. Of particular significance in this regard was defendant’s admission to Ella Ivy, made during the afternoon of January 18, prior to the discovery of the crimes, that the two victims were dead. The State’s closing argument concentrated on these aspects of the case. Notably, it was not until rebuttal argument that the prosecution mentioned the evidence regarding the bloodstained trousers. As the circuit court noted when it denied defendant’s motion for DNA testing, the bloodstain evidence was essentially a collateral issue at trial and was not central to the State’s evidence of guilt. Under these circumstances, a test result favorable to defendant would not significantly advance his claim of actual innocence, but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State.

Arguing that the blood evidence played a more significant role in his conviction, defendant cites two passages from the State’s rebuttal argument at the conclusion of the trial, in which the prosecutor referred to the bloodstained trousers as evidence of defendant’s guilt. These comments, however, were made only in response to defendant’s own closing argument, in which defense counsel cited defense evidence showing that the trousers belonged to defendant’s father and had become bloody when the father injured his leg. Rather than demonstrating the importance of the evidence of the bloodstained trousers, the State’s rebuttal argument establishes its relative insignificance. That the prosecutor waited until rebuttal to refer to the match between Connie Cooper’s blood type and the blood type found on the trousers further indicates that the trousers were only a minor part of the State’s array of evidence against defendant. This assessment is borne out by a review of the record, which as we have noted, contains stronger evidence of defendant’s guilt than the bloodstained trousers. This evidence includes defendant’s inculpatory comments made to several friends only hours after the murders occurred, as well as statements made by defendant to police in which defendant revealed a knowledge of the crime scene that only the offender could have had.

CONCLUSION

For the reasons stated, the judgment of the appellate court, affirming the judgment of the circuit court of Peoria County, is affirmed.

Judgment affirmed
.

FOOTNOTES
1:     
1
On appeal, defendant has abandoned this request.