THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK A. PURSLEY, Defendant-Appellant.

Second District   No. 2—09—0913

Opinion filed January 26, 2011.

Robert R. Stauffer, Andrew W. Vail, and Kyle A. Palazzolo, all of Jenner & Block LLP, and Steven A. Drizin, of Bluhm Legal Clinic, both of Chicago, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the judgment of the court, with opinion.

Presiding Justice Jorgensen and Justice Birkett concurred in the judgment and opinion.

## OPINION

Defendant, Patrick A. Pursley, appeals the circuit court order that denied his motion for postconviction ballistics testing. Defendant has long pursued postconviction ballistics testing related to the murder of Andrew Ascher,[1] even as the relevant statute has changed. At this time, we grant defendant the relief requested and reverse the trial court's denial of his motion for postconviction ballistics testing and remand for further proceedings.

After a jury trial, defendant was found guilty of first-degree murder (720 ILCS 5/9—1(a)(3) (West 1992)) committed during the course of an attempted armed robbery (720 ILCS 5/8—4 (West 1992)). Defendant was sentenced to natural life in prison. On direct appeal, this court affirmed defendant's conviction and sentence. See *People v. Pursley*, 284 Ill. App. 3d 597 (1996). In July 1997, defendant filed a petition for postconviction relief under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1996)). The trial court dismissed defendant's petition as frivolous and patently without merit, and this

---

[1]The record indicates that the proper spelling of the victim's name is "Ascher" as opposed to previous opinions containing the spelling "Asher."

court affirmed the trial court's dismissal. See *People v. Pursley*, No. 2—97—0984 (1999) (unpublished order under Supreme Court Rule 23). Thereafter, in March 1999, defendant filed a second postconviction petition, which was also dismissed. This court affirmed the trial court's dismissal of defendant's second petition for postconviction relief. See *People v. Pursley*, No. 2—00—0551 (2001) (unpublished order under Supreme Court Rule 23).

Defendant next appealed from a judgment by the trial court denying his motion for ballistics testing pursuant to section 116—3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116—3 (West 2000)). Specifically, defendant argued that section 116—3 permitted ballistics testing under the Integrated Ballistics Identification System (IBIS). This court disagreed, holding that section 116—3 of the Code pertained only to fingerprint and forensic DNA testing. *People v. Pursley*, 341 Ill. App. 3d 230, 237 (2003). In 2007, the legislature amended section 116—3 of the Code to include IBIS testing. On April 6, 2008, defendant proceeded to file a *pro se* motion for ballistics testing under the amended section 116—3. At a hearing on October 24, 2008, *pro bono* counsel appeared on behalf of defendant. The court advised counsel that it sought answers to what specific forensic testing defendant was requesting, whether the evidence in the State's possession was amenable to such testing requested, and what the testing would demonstrate or potentially demonstrate. On January 5, 2009, counsel filed an amended motion for postconviction testing pursuant to section 116—3 and a response to the court's questions.

On July 31, 2009, the court issued its decision denying defendant's motion. The order indicated that defendant requested IBIS ballistics testing, that such testing was authorized by section 116—3, that such testing was not available at the time of trial, and that the parties disputed whether IBIS testing would produce more probative results under the present circumstances. The court reasoned that even if IBIS testing were used, any potential match would still require hands-on comparison and testing by a ballistics expert. The court agreed that DNA and fingerprint analysis use computerized databases and also require expert comparisons. The court decided that IBIS testing is not comparable to DNA testing, because IBIS testing "provides a course or gross collection of specimens for purposes of later refined testing by a well-qualified expert using stereomicroscopy." The court determined that IBIS testing does not supersede the comparisons performed by ballistics experts, and in defendant's trial, "all the ballistics evidence was tested by firearms experts and nothing was left out." Even with the IBIS testing, defendant's gun could not have been ruled out, because IBIS testing is preliminary and the subsequent hands-on test-

ing would have been needed to make a conclusive match, according to the court. Therefore, the court ruled that IBIS testing would not provide a reasonable likelihood of more probative results, and the evidence would not be materially relevant to defendant's claim of actual innocence.

Defendant timely appealed, arguing that IBIS testing under section 116—3 is mandatory once the conditions of the statute are met. Defendant argues that he has met those conditions. First, the statute provides that a defendant may move for testing if either of two requirements is met: (1) the evidence was not subject to the testing now requested at the time of trial; or (2) the evidence although previously subjected to testing can be subjected to additional testing using a method that was not scientifically available at the time of trial and that provides a reasonable likelihood of more probative results. Defendant argues that the trial court determined that IBIS testing was not available at the time of his trial, thus meeting the first prong of the first requirement. Second, it was undisputed that identity was an issue in defendant's trial and that the evidence to be tested was subject to a chain of custody sufficient to establish that it had not been altered. Finally, two more conditions must be met for the court to order the testing: (1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to defendant's assertion of actual innocence even though the results might not completely exonerate him; and (2) the testing requested employs a scientific method generally accepted within the relevant scientific community. Defendant argues that the second condition was not in dispute and that the trial court erred in its application of the first condition. Defendant argues that IBIS testing would potentially produce materially relevant evidence by placing both the test rounds and evidence from the crime scene into the IBIS system to determine if they would be considered a high-confidence or low-confidence match with each other. In addition to being compared to the test rounds, crime scene evidence could be compared to evidence from other crimes that have been entered into the database. According to defendant, IBIS testing could reveal that ballistics evidence from the crime scene might match a weapon that was used in a crime *after* defendant was incarcerated, which could be exonerating evidence as the State heavily relied upon the ballistics evidence produced at trial.

We review *de novo* a trial court's ruling on a motion under section 116—3 of the Code because the trial court's decision is based upon its assessment of the pleadings and trial transcripts rather than the credibility of any witnesses. *Pursley*, 341 Ill. App. 3d at 234. As stated, the trial court determined that IBIS testing would not provide a reason-

able likelihood of more probative results and that any evidence obtained from the use of IBIS would not be materially relevant to defendant's claim of actual innocence. Defendant argues that these findings by the trial court were erroneous because it needed to consider only whether an IBIS search had the potential to produce new, noncumulative evidence materially relevant to defendant's assertion of actual innocence even if the evidence would not completely exonerate him. The court, defendant argues, need not have considered whether the use of IBIS would provide a reasonable likelihood of more probative evidence.

Resolution of defendant's appeal requires us to interpret the language of section 116—3 of the Code. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Id.* at 235. The language used by the legislature is the best indicator of legislative intent, and it must be given its plain and ordinary meaning. *Id.* When the terms used by the legislature are clear and unambiguous, it is not necessary to resort to other aids of construction. *Id.*

The current version of section 116—3 provides:

"Motion for fingerprint, Integrated Ballistic Identification System, or forensic testing not available at trial regarding actual innocence.

(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5—4—3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial; or

(2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116—3 (West 2008).

We will consider each requirement of section 116—3 in turn. The State first argues that section 116—3(a)(1) is vague and inconsistent because IBIS was available but not used on a widespread basis at the time of defendant's trial. We reject this argument as section 116—3(a)(1) unambiguously requires only that the evidence was not subjected to the requested testing at the time of trial, and not that the testing was unavailable at the time of trial. Here, the ballistics evidence was undisputedly not entered into the IBIS database at the time of defendant's trial. Regardless, according to a February 2010 Fact Sheet published by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the National Integrated Ballistics Information Network (NIBIN) began in 1999, whereby the ATF began administering automated ballistics imaging technology for partner agencies. Fact Sheet: National Integrated Ballistic Information Network (February 2010), http://www.atf.gov/publications/factsheets/factsheet-nibin.html. The State's argument that the type of firearm comparison used by IBIS and firearms experts following an IBIS search was available at the time of trial may be correct, but an expert comparison of evidence to the thousands of available pieces of evidence contained in the IBIS database was not. Thus, at the time of defendant's trial, the IBIS database was not in existence, and more importantly, the evidence was not subjected to an IBIS search, thereby satisfying section 116—3(a)(1).

Regarding subsection (a)(2), the State argues that the ballistics evidence in this case was previously subjected to testing and that the additional IBIS testing would not provide more probative results. We reject this argument as we have discussed that defendant satisfied subsection (a)(1). Because sections 116—3(a)(1) and (a)(2) are connected by the word "or," and defendant satisfied subsection (a)(1), we need not evaluate whether subsection (a)(2) was satisfied. "Or" is a conjunction defined as "a function word to indicate (1) an alternative between different or unlike things, states, or actions ***[;] (2) choice between alternative things, states, or courses." Webster's Third New

International Dictionary 1585 (1986). Defendant was not required to satisfy both subsection (a)(1) *and* subsection (a)(2).[2]

The State argues, relying on *People v. Boatman*, 386 Ill. App. 3d 469 (2008), that because the ballistics evidence was subjected to some testing, defendant was required to satisfy subsection (a)(2). In *Boatman*, the defendant requested DNA testing on evidence even though, at the time of his trial, DNA testing was available. *Id.* at 470. The court held that it was sufficient for the defendant to request forensic testing on evidence that was not previously subjected to the testing that he was now requesting. *Id.* at 472. The court held that it was not necessary for the defendant to allege that the testing was unavailable at the time of his trial unless he was seeking to subject the evidence to additional testing. *Id.* Here, the State argues that the evidence was subjected to previous testing and that defendant thus was required to establish that the testing requested was unavailable at the time of his trial. We find the State's argument unpersuasive and, regardless, we have determined that an IBIS search was not performed at the time of defendant's trial because the database was not in existence. While the State argues that IBIS technology was developed in 1990 and purchased by the ATF in 1993, the technology was not utilized in the manner known presently as IBIS until 1999.[3]

Moving on, the parties do not dispute that the requirements of a *prima facie* case (identity and chain of custody) set forth in subsection (b) were met, leaving us to consider subsection (c). Subsection (c) dictates that the trial court *shall* allow the testing requested upon the determination of two factors: (1) the testing has the scientific potential to produce new, noncumulative evidence that is materially relevant, though not necessarily exonerating, to defendant's claim of actual innocence; and (2) the testing employs a generally accepted scientific method. The parties do not dispute the second factor listed but they do dispute whether the testing has the scientific potential to produce

---

[2]Defendant argues that the trial court erred by considering whether he satisfied subsection (a)(2). Given defendant's satisfaction of subsection (a)(1), any error was harmless.

[3]In support of the State's argument that IBIS was available in 1993, it submitted an article, CRS Report for Congress on National Integrated Ballistics Information Network (NIBIN) for Law Enforcement, July 3, 2001, which was written by William C. Boesman and William J. Krouse. The State neglects to point out that the article discusses that there were two computerized systems with limited capabilities and a limited number of participating agencies. The systems did not begin to unify into the system now known as IBIS until late 1999. The systems actually combined into a usable database in March 2000.

"new, noncumulative evidence materially relevant" to defendant's claim of actual innocence. We believe that using IBIS to search for additional matches has the potential to produce new evidence to satisfy subsection (c).

An explanation of IBIS is necessary to understand whether defendant has satisfied subsection (c). Agencies that partner with the ATF, such as the local law enforcement agencies of this state, use IBIS to acquire digital images of the markings recovered from crime scene and test evidence and compare those images in a matter of hours against earlier entries into the IBIS system using electronic image comparison. Fact Sheet, *supra*. If a "high-confidence" match emerges, firearms examiners compare the original evidence with a microscope to confirm the match or "NIBIN hit." Fact Sheet, *supra*. "By searching in an automated environment either locally, regionally, or nationally, NIBIN Partners are able to discover links between crimes more quickly, including links that would never have been identified absent the technology." Fact Sheet, *supra*. The ballistics information contained in IBIS is limited to those pieces of evidence taken into custody by law enforcement pursuant to criminal investigations. Fact Sheet, *supra*. A "NIBIN hit" is defined as a linkage of two different crime scene investigations by partner agencies where previously there had been no known connection between the investigations.

In its decision, the trial court interpreted "materially relevant to the defendant's assertion of actual innocence" without considering the language preceding that phrase, particularly that the "testing has the scientific *potential* to produce new, noncumulative evidence." (Emphasis added.) 725 ILCS 5/16—3(c) (West 2008). The trial court relied on *People v. Johnson*, 205 Ill. 2d 381 (2002), *People v. Savory*, 197 Ill. 2d 203 (2001), and *People v. Price*, 345 Ill. App. 3d 129 (2003), to determine whether IBIS evidence would be "materially relevant." It concluded that, because defendant's ballistics evidence was tested by firearms experts and any matches produced by IBIS would also have to be evaluated by firearms experts, the new evidence would not satisfy subsection (c).

*Johnson* and *Savory*, in the context of DNA testing, construed the term "materially relevant" as used in section 116—3.[4] In *Johnson*, the defendant was convicted of a 1983 rape and murder. The State possessed a Vitullo rape kit. In postconviction proceedings, the defendant argued that he was entitled to DNA testing on the rape kit where

---

[4]We note that the language of subsection (c) did not change when the legislature amended the statute to include IBIS testing. Thus, the supreme court's construction of the language of subsection (c) still controls.

identity was a central issue at his trial, the rape kit was properly maintained in a chain of custody, and the testing could produce new evidence materially relevant to his claim of innocence. *Johnson*, 205 Ill. 2d at 393-94. The supreme court agreed that the defendant was entitled to DNA testing under section 116—3. The supreme court, adopting its earlier analysis in *Savory*, held that evidence that is " 'materially relevant' " to an actual innocence claim need not exonerate the defendant but must tend to " 'significantly advance' " the defendant's claim. *Id.* at 395 (quoting *Savory*, 197 Ill. 2d at 213). Whether the evidence would be " 'materially relevant' " requires an evaluation of the evidence introduced at trial, as well as the evidence the defendant seeks to acquire through testing. *Id.* at 396 (quoting *Savory*, 197 Ill. 2d at 213).

In *Johnson*, the evidence the defendant sought to have tested related to the genetic identity of the assailant. At trial, the State relied largely upon the rape victim's identification of the defendant, and the remainder of its evidence was circumstantial. A favorable result on the DNA test of the Vitullo rape kit would significantly advance the defendant's claim that he did not rape the surviving victim, which would also significantly advance his claim that he did not murder the surviving victim's boyfriend. *Id.*

In *Savory*, the defendant was convicted of a double homicide after confessing to the crimes. On appeal, the defendant's confession was deemed inadmissible, and he was retried and convicted after the State presented several inculpatory statements that the defendant made to friends. The defendant also made admissions to police that placed him at the scene of the murders shortly before. *Savory*, 197 Ill. 2d at 207. The State also presented physical evidence connecting the defendant to the offenses, including evidence that hairs consistent with the defendant's were found in the bathroom sink and tub of the home where the murders occurred, that a knife from the defendant's home had blood on it, and that a bloodstain found on a pair of trousers recovered from the defendant's home had the same blood type as one of the victims. *Id.* The defendant moved for postconviction DNA testing pursuant to section 116—3, arguing that the blood on the trousers would prove not to be the victim's, thus eliminating one of the pieces of physical evidence introduced by the State. *Id.* at 208-09. The supreme court considered the transcripts of the defendant's trial, which demonstrated that the bloodstained trousers were a minor part of the State's evidence. The greater portion of the State's evidence consisted of the defendant's knowledge of certain aspects of the crime scene and his incriminating statements to various people. *Id.* at 214-15.

In *Price*, the defendant was convicted of several counts of criminal sexual assault after two prison rape incidents. At trial, the two victims and a co-assailant testified against the defendant, in addition to another witness. Subsequently, pursuant to section 116—3, the defendant moved for DNA testing on the swabs taken from the victims. Relying on *Savory* and the language of the statute, this court considered whether the evidence tended to significantly advance the defendant's claim of actual innocence, noting that section 116—3 demands only that the proposed testing have the scientific potential to return favorable evidence. *Price*, 345 Ill. App. 3d at 133-34. Despite the compelling evidence against the defendant, this court determined that a favorable DNA test would significantly advance the defendant's claim that he did not sexually assault the victims. *Id*. at 140. This court noted that the defendant was merely moving for forensic testing and would still have to overcome more significant hurdles should the defendant get to a postconviction petition proceeding. *Id*. at 134-35, 140.

Here, we consider what evidence could result from an IBIS search. The best outcome that defendant could obtain from IBIS testing is that the crime scene evidence could be "matched" to the evidence of another crime that occurred after police confiscated defendant's Taurus gun, thus implicating another possible weapon besides defendant's gun. We next consider whether such evidence tends to significantly advance defendant's actual innocence claim. Whether such evidence is materially relevant requires an evaluation of the evidence introduced at trial in addition to the evidence defendant seeks to acquire through testing. Such evidence would impeach the State's evidence that the crime scene bullets and casings came from defendant's Taurus to the exclusion of all other guns.

We first note that the record does not contain portions of defendant's trial. We therefore rely upon the transcripts that are available in the record and the facts of the case set forth in our previous opinions: *Pursley*, 284 Ill. App. 3d at 600-03, and *Pursley*, 341 Ill. App. 3d at 232-33. Anything missing from the record or our previous opinions will be construed against defendant. *Wackrow v. Niemi*, 231 Ill. 2d 418, 428 n.4 (2008) (appellant has the burden of presenting a sufficiently complete record of the proceedings at trial). In addition to the facts set forth in our earlier opinions, we summarize the relevant testimony available in the record relating specifically to the ballistics evidence and the State's closing arguments.

At trial, the parties stipulated that there was no chain of custody issue with the items retrieved from the scene or defendant's apartment. The items in evidence included a Taurus gun and magazine,

two fired bullet slugs, two spent bullet casings, and fired bullet fragments. Jack Welty, a forensic toolmark and firearms expert with the Illinois State Police lab, testified for the State that he first received the crime scene evidence and determined that the bullets and casings came from a 9-millimeter weapon, most likely from an Astra, Beretta, or Taurus gun. Another 9-millimeter gun could be the source but, based on the fact that these three types were the most common, Welty believed that one was the likely source. He based his opinion on his examination of the lands, grooves, and striations and comparison with those contained in an FBI manual of general rifling characteristics.

Daniel Gunnell, a firearms and toolmark scientist with the Illinois State Police, testified for the State. Gunnell explained the process he employed to examine the fired bullet slugs. He testified that he first examined the fired evidence, namely, the number of lands and grooves and twists of the bullets, and he put the fired bullets on a comparison microscope. Using the microscope, Gunnell compared both fired bullets to see if they had the same class characteristics. After determining that the fired bullets and the bullet casings had similar class characteristics, Gunnell then fired two test shots. Gunnell explained that the test fires provided a known standard from the Taurus gun to compare with the evidence retrieved from the scene. Gunnell then compared the crime scene evidence and the test-fired evidence on the comparison microscope.

Gunnell testified that "both of these two evidentiary discharged cartridge cases were, in fact, fired from this firearm [Taurus gun] to the exclusion of all other firearms." To reach this conclusion, Gunnell relied on the microscopic striations that were present and the impressions created by the firing mechanism of the gun. He compared the number of lands and grooves, the width of the lands and grooves, and the direction of twist. As the bullet travels through the barrel, it picks up the flaws, scratches, and marks in the barrel, and these marks are visible as microscopic striations on the surface of the bullet. Such marks, Gunnell explained, are unique to that firearm, similar to a fingerprint. The striations need not be a perfect match, according to Gunnell, because there is no such thing as a homogeneous piece of metal.

On cross-examination, Gunnell admitted that he did not perform a firing pin comparison test, because the initial comparisons established sufficient similarities. He also admitted that he did not take any photographs of any of the evidence. Gunnell admitted that he could compare only one-third of the area because of damage to the bullets. He stated that this had no effect on his conclusion that the crime scene bullets were fired from the Taurus gun to the exclusion of all

other guns. The test bullets landed in a box of cotton waste to avoid external contributors to the striations on the metal. He admitted that one of the bullets from the crime scene was retrieved from the dashboard of the car that Ascher was sitting in.

Mark Boese, defendant's firearms and toolmark expert, testified that he also used the Taurus gun to fire test shots. He compared his test casings to the State's test casings and determined that they had identical impressions. Boese photographed his comparison slides and identified them. He used the State's test slides for his comparisons with the crime scene evidence. Boese determined that the crime scene evidence contained three or four striations that were similar to the test casings, but their positions with respect to one another were dissimilar. Boese also testified that the firing pin impressions were dissimilar. Boese described several striations that were present on the crime scene evidence but that appeared different in the test evidence. As a result of these differences, Boese could not say that the Taurus gun fired the two bullets retrieved from the crime scene. Boese opined that the crime scene bullets were probably fired from a Taurus gun but not the specific Taurus gun retrieved from defendant's apartment. Boese could not conclusively exclude the Taurus gun retrieved from defendant's apartment. There simply were insufficient similarities to make a determination.

In addition to the ballistics testimony, Becky George, Ascher's girlfriend, testified that a man wearing dark clothing and a blue ski mask with a hood over the mask approached Ascher's vehicle while they were parked in front of George's brother's apartment building. The skin around the man's eyes appeared black. The man pointed a gun at her and Ascher and demanded money. As George looked for money in her purse, she heard gunshots. The robber turned east and ran. *Pursley*, 284 Ill. App. 3d at 600. David Bodell, a nearby resident, testified that he saw a man about 6 feet 3 inches tall running toward a field after he heard three gunshots. The man was either a white male with dark skin or a black male. The man was wearing a dark blue sweatshirt and black jeans. *Id.* at 602-03. However, Bodell also said that the man had a mustache, gave inconsistent accounts of his distance from the man, and did not see a ski mask like George described.

A couple of months after the shooting, Marvin Windham anonymously called Crimestoppers to advise that defendant told him he killed Ascher. A couple of days after receiving Windham's tip, police followed defendant and his girlfriend, Samantha Crabtree, in their vehicle. *Id.* at 600-01. Defendant jumped out and evaded police. Crabtree remained and gave a statement to police, implicating

defendant in the murder and describing defendant's clothing consistently with George's statement. Specifically, she told police that she drove defendant to the area where the murder occurred and waited for defendant around the corner. She heard gunshots and then defendant returned and told her to drive. Police recovered the Taurus gun from the apartment that Crabtree and defendant shared. Later, Crabtree testified in contradiction to her earlier statements to police and the grand jury. She stated that her earlier statements implicating defendant were coerced and that she and defendant never left their apartment on the night of the murder. *Id.* at 602.

A few days later, Windham called Crimestoppers again and gave his name and a statement. Windham testified that defendant told him that he robbed and murdered Ascher. On cross-examination, Windham admitted that he received $2,650 in reward money for his information. He admitted that he waited two months before giving police his information because defendant began to threaten him for knowing too much. Windham had two criminal charges pending.

Diane Winters, a friend of defendant's, testified that defendant called her a month prior to Ascher's murder and asked if she would buy bullets for Crabtree's gun. *Id.*

Defendant presented witnesses, including his 10-year-old son Anthony, Anthony's 11-year-old uncle Arron Davis, Anthony's grandmother Myra Foster, and Myra's friend Penny Bunnell, who provided testimony of his whereabouts on the night of the murder. However, all witnesses were impeached in some way regarding times, previous statements to investigators, and delays in coming forward with alibi information. *Id.*

There is no doubt that the State relied upon the ballistics evidence. The defense similarly relied upon the testimony of Boese. In fact, the defense began closing arguments with a very lengthy review of the ballistics evidence, attempting to discredit the State's experts and opinions. After that concluded, the defense commented on the unreliability of Windham, the reliability of Crabtree's trial testimony over her previous statements, and the statements made by Bodell that favored defendant. The State, on the other hand, equally argued its evidence, discussing the testimony of Windham and Winters, Crabtree's initial statements, Welty's initial opinion regarding the type of gun, Gunnell's ballistics opinions, George's description of the assailant, and how each piece consistently linked defendant. The State argued that defendant's expert could not exclude defendant's gun and that his alibi witnesses all came forward with information just before trial and contradicted their earlier statements to investigators. To say that the State completely relied on Gunnell's testimony would be to misinterpret the entirety of the evidence.

With that being said, we cannot disregard the fact that much of the State's remaining evidence was circumstantial like in *Johnson*. Unlike in *Savory*, defendant did not make inculpatory statements to police. Although the defendant in *Savory* did make inculpatory statements to friends, Windham obtained financial benefit for providing his statement, and Crabtree changed her story at trial. The facts of *Price* are more similar to the facts here as both defendants maintained their innocence and the new evidence had the potential to significantly advance their claims. This is merely a motion to acquire the testing; even if favorable testing results, defendant must succeed on a postconviction petition, which carries more difficult hurdles, to obtain any substantive relief. The trial court considered that, even if IBIS testing were performed, a hands-on comparison would still need to occur and the ballistics experts in this case had already performed such a comparison. We disagree with the trial court on this point. The hands-on comparison would involve an additional set of crime scene evidence and possibly test evidence of another weapon that was input into the IBIS system. Therefore, the hands-on analysis that potentially would be performed if a match resulted would not be the same hands-on analysis that was already performed.[5]

While the State argues that an IBIS search is nothing more than a "fishing expedition," allowing defendant to reopen his case merely because a database was established, the legislature obviously believes otherwise since it amended the statute to specifically allow for IBIS testing. Even if we agreed with the State, we cannot render the statute meaningless. Whether IBIS is a "forensic test" or an "investigative tool," as the State argues, the legislature has decided that a defendant satisfying the statutory requirements may seek postconviction IBIS testing. The pros and cons of the IBIS system as argued by the State are irrelevant because section 116—3 has already been amended to include IBIS testing, rightly or wrongly.

In conclusion, we find that defendant met the requirements of a section 116—3 motion for postconviction IBIS testing. We therefore reverse the judgment of the circuit court of Winnebago County and remand for further proceedings consistent with this opinion.

Reversed and remanded.

---

[5]The State cites *United States v. Green*, 405 F. Supp. 2d 104, 116 (D. Mass. 2005), for the proposition that, even if IBIS suggests numerous possible matches, the expert will not check them all once he has found a match. This proposition, however, is derived from one expert testifying as to his routine as a forensic technician with the police department; he was not testifying to the protocol for *all* forensic scientists.