# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Rozo*, 2012 IL App (2d) 100308

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LOUIS C. ROZO, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0308 |
| Filed<br>Rehearings denied | May 21, 2012<br>July 13, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of material found under the fingernails of the person defendant was convicted of murdering was improperly denied by the trial court, since it was possible, based on the evidence presented about the struggle that resulted in the victim's death, that the victim could have gotten the murderer's skin or blood under his fingernails while trying to protect himself, the new evidence could advance defendant's claim of innocence if the DNA matched that of the person defendant claimed to be the real murderer, and under the circumstances, section 116-3(a) allowed for comparative testing of the new evidence to the DNA evidence previously obtained from two other men defendant alleged to have actually been involved in the murder. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 96-CF-3449; the Hon. John T. Phillips, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Thomas A. Lilien and Yasemin Eken, both of State Appellate Defender's
Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer
and Jay Paul Hoffmann, both of State's Attorneys Appellate Prosecutor's
Office, of counsel), for the People.

Panel

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Burke and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1     Defendant, Louis C. Rozo, appeals from the trial court's denial of his motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2008)). We affirm in part, reverse in part, and remand for further proceedings.

¶ 2     Following a jury trial, defendant was convicted of two counts of murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 1996)) in the death of Christy Shervanian and sentenced to concurrent extended terms of 75 years in prison. This court vacated one of the convictions and one of the sentences as improperly arising from the same physical act but affirmed the other conviction and sentence. See *People v. Rozo*, 303 Ill. App. 3d 787 (1999).

¶ 3     In December 2008, defendant filed a motion for DNA testing pursuant to section 116-3 of the Code, seeking: (1) the testing of tissue and/or blood samples that had been found under Shervanian's fingernails but had not been tested before defendant's trial; (2) the testing of previously tested blood samples recovered from a glove found at the murder scene and from defendant's leather jacket "using the current, best practice technology, DNA-STR analysis," which was not used in the prior testing; and (3) the testing of DNA samples of Rudolph Zink, a State witness at defendant's trial, and Bruce Derrickson, Zink's roommate and paramour at the time of Shervanian's murder. According to defendant, these tests would "produce new, noncumulative evidence materially relevant to his assertion of actual innocence in this case." Defendant further averred that Zink's attorney in a prior criminal matter had information relevant to Zink's commission of perjury at defendant's trial and other information implicating both Zink and Derrickson in Shervanian's murder; defendant asserted that this information could now be accessed because of Zink's death. The trial court denied defendant's motion and his subsequent motion to reconsider, and this appeal followed.

¶ 4     Section 116-3 provides in relevant part:

"Motion for fingerprint, Integrated Ballistic Identification System, or forensic testing not

-2-

available at trial regarding actual innocence.

(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint, Integrated Ballistic Identification System, or forensic DNA testing, including comparison analysis of genetic marker groupings of the evidence collected by criminal justice agencies pursuant to the alleged offense, to those of the defendant, to those of other forensic evidence, and to those maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections, on evidence that was secured in relation to the trial which resulted in his or her conviction, and:

(1) was not subject to the testing which is now requested at the time of trial; or

(2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial court which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a demonstration that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3 (West 2008).

Testing pursuant to section 116-3 is not limited to situations in which the requested testing would completely exonerate a defendant. *People v. Savory*, 197 Ill. 2d 203, 214 (2001). Rather, the testing must have the potential to produce evidence that "tends to significantly advance" the claim of actual innocence. *Savory*, 197 Ill. 2d at 213. Whether such evidence would be materially relevant requires an evaluation of the trial evidence and the evidence that the defendant seeks to acquire through the testing. *People v. Pursley*, 407 Ill. App. 3d 526, 534 (2011). We review *de novo* the trial court's ruling on a motion brought under section 116-3, as the court's decision is based on its assessment of the pleadings and trial transcripts as opposed to the credibility of any witnesses. *Pursley*, 407 Ill. App. 3d at 529.

¶ 5   We will consider each requirement of section 116-3 in turn. We first note that there is no dispute that identity was at issue in this case or that a proper chain of custody was maintained; thus, the *prima facie* case requirement of section 116-3(b) has been fulfilled.

¶ 6   Section 116-3(a) requires that the evidence that defendant seeks to have tested either: (1)

was not subjected to the testing that is now requested at the time of trial; or (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results. 725 ILCS 5/116-3(a)(1), (a)(2) (West 2008). The tissue/blood samples found under Shervanian's fingernails were never tested. See *Rozo*, 303 Ill. App. 3d at 792. Clearly, this fits within section 116-3(a)(1).

¶ 7    Defendant also seeks the testing of previously tested blood samples recovered from a glove found at the murder scene and from defendant's leather jacket "using the current, best practice technology, DNA-STR analysis," which was not used in the prior testing. Defendant, citing to this court's decision in *Pursley*, argues that, while this evidence was previously tested, it was not subjected to the now-requested DNA-STR testing, and such testing should then be allowed under subsection (a)(1). The State argues that, in order to obtain new testing of the jacket and glove, defendant must establish that DNA-STR testing was not available at the time of his trial, under subsection (a)(2). We agree with the State.

¶ 8    In *Pursley*, the trial court denied the defendant's motion for Integrated Ballistic Identification System (IBIS) testing pursuant to section 116-3. The ballistics evidence had been tested by firearms experts before trial but had not been tested under the IBIS system. *Pursley*, 407 Ill. App. 3d at 528. The State argued that IBIS was available but not used on a widespread basis at the time of trial; thus, subsection (a)(1) was inapplicable. *Pursley*, 407 Ill. App. 3d at 531. However, the "expert comparison of evidence to the thousands of available pieces of evidence contained in the IBIS database" had not been available to the defendant, as the Bureau of Alcohol, Tobacco, Firearms and Explosives did not begin administering automated ballistics imaging technology for partner agencies until 1999, after the defendant had been convicted. *Pursley*, 407 Ill. App. 3d at 531.

¶ 9    In interpreting a statute, we are to give the language used by the legislature its plain and ordinary meaning. *Pursley*, 407 Ill. App. 3d at 530. Further, we construe a statute as a whole, so that no part is rendered meaningless or superfluous. *People v. Dalton*, 406 Ill. App. 3d 158, 163 (2010). Section 116-3 was amended in 2007 to specifically allow a defendant to seek firearm testing under the IBIS system (see *Pursley*, 407 Ill. App. 3d at 528); it was not amended to merely allow a defendant to seek generic firearm forensic testing. The defendant in *Pursley* requested a specific, statutorily enumerated test that had not been conducted at the time of trial. Thus, the request clearly fit within the purview of subsection (a)(1). Here, the evidence from the jacket and the glove had been subjected to generic (nonstatutorily enumerated) forensic testing at the time of trial, and defendant now seeks additional generic (nonstatutorily enumerated) forensic testing of that same evidence. There is no statutory reference allowing a defendant to specifically request DNA-STR genetic testing if such a test had not been previously conducted on the evidence. Concluding that previously tested blood samples do not fit under the subsection (a)(2) requirements for evidence previously subjected to testing would be nonsensical and would require us to disregard the language of that subsection. This, we shall not do. Defendant's request for DNA-STR testing of the blood samples recovered from the glove and from defendant's leather jacket must be analyzed under subsection (a)(2).

¶ 10    Under subsection (a)(2) defendant must show that the evidence "can be subjected to

additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a)(2) (West 2008). The State argues that DNA-STR testing was already available at the time of defendant's 1997 trial, citing to *People v. Barker*, 403 Ill. App. 3d 515, 525 (2010), which noted that DNA-STR testing "was not widely adopted until the mid to late 1990s." (Internal quotation marks omitted.) However, at trial, the State presented the testimony of Sarah Thibault, a forensic scientist working in the area of DNA analysis for the Illinois State Police (ISP). Thibault testified that she was "currently involved in a research project which implements STR's [*sic*] or short tandem repeats as new methodology in the area of forensic DNA analysis." Defendant attached to his motion for DNA testing the affidavit of Pravatchai W. Boonlayangoor, Ph.D., and Karl A. Reich, Ph.D., of Independent Forensics of Illinois, who were hired as experts to review the scientific analysis portion of the trial transcript. In their opinion, the ISP laboratory did not use DNA-STR testing for the blood from the glove and the jacket; however, they also opined:

> "16. That in our opinion, any forensic DNA analyst or forensic institution with a moderate or high degree of scientific acumen and experience would be aware that *at the time ISP conducted the DNA-based tests on the evidence samples in this case*, another, more specific, sensitive, discriminating and superior test technology, *DNA-STR analysis, was in fact available and in use*." (Emphases added.)

The burden is on defendant to show that the requested testing was "not scientifically available at the time of trial." 725 ILCS 5/116-3(a)(2) (West 2008). The standard is not whether the lab that tested the evidence had fully implemented that particular test but whether the test was "*not scientifically available*." (Emphasis added.) Defendant's own experts clearly opined that the requested test "was in fact available and in use" at the time of trial. Thus, defendant has not sustained his burden as to additional testing of the bloodstains found on the glove and the jacket.

¶ 11    Even after showing that the nail evidence was not tested, defendant must still demonstrate that the result of such testing:

> "has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the results may not completely exonerate the defendant." 725 ILCS 5/116-3(c)(1) (West 2008).

Materially relevant evidence is that which tends to significantly advance a defendant's claim of actual innocence. *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 27. However, such evidence need not exonerate the defendant. *People v. Johnson*, 205 Ill. 2d 381, 395 (2002). In determining whether testing would reveal materially relevant evidence, we consider the trial evidence and assess the evidence that the defendant seeks to acquire through testing. *Johnson*, 205 Ill. 2d at 396. However, the strength of the State's evidence is not a hurdle that the defendant must overcome to meet the requirements of the statute. *Barrow*, 2011 IL App (3d) 100086, ¶ 27.

¶ 12    There was little direct evidence in this case. At about 3:50 p.m. on December 1, 1996, one of Shervanian's neighbors heard two men screaming at each other, as if arguing, in Shervanian's house. Several minutes later, as she drove away with her mother, she saw a red

Firebird parked nearby; no one was in or standing near the car. Her mother, who had seen Zink's gold Jaguar parked in Shervanian's driveway many times, testified that it was not in the driveway at that time. At about 5:25 p.m., another neighbor saw flames coming from Shervanian's house. Shervanian was found in his bedroom, his face covered with red tape. The piping of a lamp was bent around his head, and the lamp cord and a blood pressure cuff were wrapped around his neck. A latex glove was found near his head. Shervanian died from a combination of injuries, including blunt and sharp force injuries and strangulation. He had also sustained a number of cuts on his hands that may have been defensive wounds.

¶ 13    Defendant spoke with officers and gave an account of his activities that was evasive and full of contradictions, even as to whether he knew where Shervanian lived and whether he had been in that neighborhood on the day of the murder. However, he always denied any involvement in Shervanian's death. He also denied being a homosexual and denied being anything more than friends with Zink. Officers noted scratches on defendant's face and hands. At first, defendant said that he had cut his hands cleaning a filter in his fish tank; he later said that he had cut his hands while repairing part of his car with plastic zip-ties.

¶ 14    Zink testified that he had had sexual relationships with both Shervanian and defendant, but not during the same period of time. (Another witness testified that Shervanian and Zink were still intimate at the time of the murder but that Shervanian had told him that the relationship would soon be over.) While defendant knew that Zink and Shervanian were friends, he did not know of Zink's prior sexual relationship with Shervanian. Zink had been to brunch with Shervanian on the day of the murder, dropping him off at his house between 3 and 4 p.m.

¶ 15    Defendant testified that, on the day of Shervanian's death, he had gone to Shervanian's house to drop off newspapers to be used to pack items for shipping. Zink's car was in the driveway. Defendant entered the house through an open sliding door and eventually saw Zink exiting Shervanian's bedroom covered in blood. Zink told him that there had been a small accident but that everything was all right. Zink was nervous and angry; he put his hand on defendant's jacket, zipped it up, and guided defendant out of the house. Defendant did not tell the police about this incident, either when he first heard on the radio that Shervanian was killed or when he was questioned by the police, because he did not think that there could be a connection between the two events.

¶ 16    At defendant's home, police found a box of latex gloves similar to the glove found near Shervanian's head. They also found a leather jacket and a pair of shoes that had recently been washed. Officers also recovered plastic nylon ties and a roll of masking tape.

¶ 17    Forensic testing revealed a fingerprint inside the glove found near Shervanian's head. While one expert testified that the print was a definite match to defendant, the expert admitted that the print contained two "bifurcations" that were not on defendant's known prints. Another expert testified that, because of the bifurcations, the evidence was inconclusive as to whether the print matched defendant. Testing of blood discovered on the jacket and the glove revealed various results. Some of the threads tested revealed a mixture of DNA profiles that "could have originated from Shervanian and Rozo." Other threads revealed a mixture that included Shervanian as "a possible donor" and included "a second

donor also identified who was present yet the results were uninterpretable." Another thread contained a mixture that matched Shervanian's profile but not defendant's. Yet another thread showed a mixture of DNA profiles that included Shervanian's and a second profile that was uninterpretable because it was present "in such a low level." In all the tests done on the jacket and the glove, no "foreign DNA type" different from that of Shervanian or defendant was found.

¶ 18    Evidence was presented tying defendant to two recent crimes committed against Shervanian. Defendant was seen twice driving past Shervanian's home after an arson fire had been set there. Less than two weeks before the murder, a bomb had been attached to Shervanian's van with plastic ties similar to those found in defendant's home. An expert testified that tape used on the bomb came from the roll of tape recovered from defendant's home. Two witnesses testified that defendant had spoken to them about a book that contained information about building bombs; pages of this book were found scattered in Shervanian's driveway.

¶ 19    Considering this trial evidence, we conclude that testing the evidence found under Shervanian's fingernails would tend to significantly advance defendant's claim of actual innocence such that testing should have been ordered. Again, the strength of the State's evidence is not a hurdle that the defendant must overcome to meet the requirements of the statute. *Barrow*, 2011 IL App (3d) 100086, ¶ 27. The evidence of Shervanian's murder showed that a violent struggle occurred; Shervanian sustained multiple types of trauma and sustained defensive wounds trying to protect himself. It is not inconceivable that Shervanian could have gotten the blood or skin of his murderer under his fingernails while attempting to protect himself from attack. If DNA found under Shervanian's fingernails were found not to be a match to defendant's, such evidence would certainly advance defendant's claim of actual innocence, even more so if it matched the DNA of Zink, thus making his trial testimony regarding Zink's bloody exit from Shervanian's bedroom more credible. This evidence clearly is the type of evidence that should be tested under section 116-3. Thus, the trial court erred in denying defendant's motion for the testing of the material under Shervanian's nails.

¶ 20    Defendant also seeks to have the results of any such testing of the tissue/blood samples found under Shervanian's fingernails compared to the DNA profiles of Zink and Derrickson. Defendant argues that such a test was not available at the time of trial, because "the statutory provision allowing for such comparative analysis and DNA database searches, 725 ILCS 5/116-3 (2004), did not become effective until November 19, 2003." However, this argument misses the point. It is not the availability of the statutory postconviction remedy that is in question; it is the lack of testing or the scientific unavailability of the testing method at the time of trial that is in question. See 725 ILCS 5/116-3(a) (West 2008). The lack of this statutory remedy at the time of trial is irrelevant; section 116-3 is a posttrial remedy, and it would not have applied to defendant's trial.

¶ 21    However, section 116-3(a) allows for comparison analysis of evidence not subjected to testing at the time of trial to "other forensic evidence" and genetic marker evidence "maintained under subsection (f) of Section 5-4-3 of the Unified Code of Corrections." 725 ILCS 5/116-3(a) (West 2008). Defendant alleged in his motion that Zink submitted to DNA

testing pursuant to section 5-4-3 while in prison and that a private investigator had obtained oral swabs containing Derrickson's DNA for testing. The State argues that, in determining whether to order such comparative testing, this court should not consider the allegations regarding the possible roles of Zink and Derrickson contained in defendant's motion, because they were not supported by affidavit or other evidence. We disagree. The ultimate question is whether the testing sought has the "potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence." 725 ILCS 5/116-3(c)(1) (West 2008). Whether evidence is materially relevant requires evaluation of the trial evidence as well as the evidence that the defendant seeks to acquire through the testing. *Pursley*, 407 Ill. App. 3d at 534. Under the testing that we have already ordered herein, defendant seeks to acquire DNA evidence from the material found under Shervanian's fingernails. That testing may reveal DNA evidence that either excludes defendant or is a mixture of DNA profiles that includes defendant's DNA profile as well as that of another person, as occurred in the testing of the blood from defendant's jacket. There is no reason not to test the already extant DNA evidence of the two other men whom defendant alleges were actually involved in the murder. This evidence would be materially relevant to defendant's claim of innocence. Based upon the totality of the present record, we need not wait for another motion to request such comparison testing at a later date. Thus, the results of the testing of the tissue/blood samples found under Shervanian's fingernails shall also be compared to the genetic information of Zink and Derrickson.

¶ 22 For these reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

¶ 23 Affirmed in part and reversed in part; cause remanded.