2024 IL App (1st) 220641-U

No. 1-22-0641

Order filed January 22, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 93 CR 21971 |
| | ) | |
| MARCOS GRAY, | ) | The Honorable |
| | ) | Peggy Chiampas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where defendant failed to establish that forensic DNA testing would produce new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 2    Following a jury trial, defendant Marcos Gray was convicted of first degree murder and armed robbery and was sentenced to concurrent prison terms of 55 years and 30 years,

respectively.[1] Defendant appeals from the circuit court's denial of his *pro se* motion for forensic DNA testing pursuant to section 116-3 of the Code of Criminal Procedure (Code) (725 ILCS 5/116-3 (West 2018)). Specifically, defendant requested DNA testing of four fingerprints lifted from the exterior of the vehicle in which the victim was shot. On appeal, defendant argues that the circuit court erred in denying his motion because he established a *prima facie* case for forensic DNA testing, and the results of the testing would materially advance his claim of actual innocence. We affirm.

¶ 3    In September 1993, defendant and Antwon Tyler were indicted on counts of first degree murder, armed robbery, attempted armed robbery, and aggravated unlawful restraint relating to a robbery and fatal shooting on West 99th Street in Chicago on March 28, 1993.[2] The State proceeded to trial against defendant on four counts of first degree murder, alleging that defendant, without lawful justification, shot and killed Edwin Carlock intentionally and knowingly (720 ILCS 5/9-1(a)(1) (West 1992)), knowing that his actions created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 1992)), and while committing the forcible felonies of armed robbery and attempted armed robbery (720 ILCS 5/9-1(a)(3) (West 1992)). The State also proceeded on one count of armed robbery, alleging that defendant, while armed with a dangerous weapon and threatening imminent use of force, took a beeper from Melvin Slaughter (720 ILCS 5/18-2(a)(2) (West 1992)).

---

[1]Although the record on appeal and the appellate brief captions refer to defendant as "Marcus," *pro se* filings indicate that defendant goes by "Marcos." Additionally, the body of defendant's appellate brief predominantly refers to defendant as "Marcos."

[2] Tyler was tried separately from defendant and is not a party to this appeal.

¶ 4     At trial, Slaughter testified that on March 28, 1993, around 10:30 p.m. or 11 p.m., Carlock drove Slaughter, Taneisheia Harden, Carlock's sons, Laveta Heffner, Sandra Carlock, and Sandra's son to Harden's residence on West 99th.[3] When they arrived, Slaughter and Harden exited the vehicle and began walking to the residence. Heffner told Slaughter that Carlock wanted his pager number. As Slaughter walked behind Carlock's vehicle, a "grayish green" Chevrolet pulled alongside the vehicle. Defendant, whom Slaughter identified in court, "jump[ed] out" the passenger side of the Chevrolet with a firearm and said to Slaughter, "don't move, motherf***." Defendant was approximately a foot from Slaughter. Slaughter fell backwards to the ground and then observed defendant fire into the vehicle through the rear driver's side window. After defendant discharged the firearm, he stated, "[t]here, motherf***." Defendant then approached Slaughter, kneeled over him, placed the firearm on his chest, and patted his clothes. Defendant stated, "[g]ive me your money." Slaughter's beeper fell out of his pocket, and defendant picked it up. Defendant returned to the Chevrolet and left.

¶ 5     On May 23, 1993, Detectives William Higgins and Edward Ciwick went to Slaughter's residence to show him a photo array. Slaughter identified an individual who had similar characteristics as defendant, including eyes and head shape, but he did not identify that individual as the offender.

---

[3] Taneisheia Harden's and Sandra Carlock's first names are spelled differently throughout the record; we adopt the spellings as they appear in the transcripts of each witness's testimony. Also, since Sandra shares the same last name as the victim, we will refer to her by her first name.

¶ 6    On August 24, 1993, Slaughter observed a photograph of defendant in the newspaper, took the photograph to Denall Morris' home, and called the police.[4] The next day, the police transported Slaughter to a police station to view a lineup, and he identified defendant.

¶ 7    On cross-examination, Slaughter testified that Harden entered the residence after exiting Carlock's vehicle. Slaughter was near the rear passenger door when the Chevrolet pulled beside him with "just enough" room to open the door. Defendant pointed the firearm at Slaughter and told him not to move. When Slaughter fell, he placed his hands over his face and did not observe defendant approach Carlock's vehicle, but he saw defendant standing next to the vehicle. Slaughter also did not observe defendant attempt to open any door and denied telling officers that defendant attempted to open a door. Slaughter described the offender to officers as a Black male, 19 to 21 years old, 6 feet tall, and approximately 180 pounds with big eyes and long hair. On redirect examination, Slaughter testified that defendant wore a big, quarter length, gray Georgetown winter coat and a backwards, red baseball hat.

¶ 8    Harden testified that after exiting Carlock's vehicle, she entered her residence and sat on the couch. She then heard a gunshot, "jumped up," and ran to a window. She observed Slaughter lying on his back and defendant, whom she identified in court, standing over him with a firearm. She also observed a "greenish gray" Chevrolet. The street was well-lit by a streetlight on the corner and her porch light, and she observed defendant "leaning over [Slaughter] like with the gun, *** patting him, like checking for money." Slaughter's pager fell, and defendant grabbed it. Defendant looked towards the window, and Harden ducked. She then observed defendant enter the Chevrolet

_____

[4] Denall Morris' first name also appears in the record as "Donnell" and "Donell," but we adopt the spelling as it appears in the transcript of his trial testimony.

and leave. Defendant and Slaughter were 25 to 30 feet from the window. Harden told officers that defendant wore a quarter length, big, blue Georgetown coat and a backwards hat. She also described defendant as having a wide and round face with "a lot of hair."

¶ 9    On May 23, 1993, Harden viewed a photo array and did not identify anyone. On August 25, 1993, she identified defendant in a lineup. She had not observed any photographs of defendant prior to the lineup.

¶ 10    On cross-examination, Harden testified that she stared at defendant through the window, and when he looked up, she looked at him before she ducked. The streetlight was a few feet from her residence on the same side of the street. She told an officer that defendant did not appear to be 6 foot 1 inches tall. Slaughter did not inform Harden about the photograph in the newspaper.

¶ 11    Heffner testified that after Harden and Slaughter exited the vehicle, Carlock asked Heffner to ask Slaughter to return to the vehicle. As Slaughter walked towards the vehicle, Sandra yelled, "Snug, he got a gun, drive off."[5] Heffner looked towards the rear driver's side and observed a "dark-skinned person with long hair with a hat on and a big jacket" bent down in the window with a firearm in his hand. In court, she identified defendant as the man. Heffner ducked, and the firearm "went off." After the gunshot, defendant said, "now, motherf****, take that." On August 25, 1993, Heffner identified defendant in a lineup.

¶ 12    On cross-examination, Heffner testified that she did not observe Slaughter return to the vehicle, because Slaughter went behind the vehicle. It was "like a hot second" from when Heffner called Slaughter to the vehicle until Sandra mentioned the firearm. When Heffner heard Sandra mention the firearm, Heffner immediately looked over her left shoulder and saw defendant's face

---

[5] Slaughter testified that Snug is Carlock's nickname.

in the window. She was not asked to describe defendant on the night of the incident, but she eventually told an officer that defendant had black hair that was "kind of long." She did not observe Slaughter lying on the ground or being robbed, and she did not see a photograph of defendant in the newspaper.

¶ 13     Sandra testified that as Slaughter walked around the rear of Carlock's vehicle, a "smoky gray or light gray" Chevrolet "pulled up." One of the children in the backseat of Carlock's vehicle said, "TT, look at the man with the gun." Sandra turned, looked out the rear window, and observed defendant "holding a gun on [Slaughter]," who fell to the ground. In court, Sandra identified defendant as the man with the firearm. She screamed to Carlock, "he got a gun, drive off." Defendant approached her door, and she locked it and ducked over the children. Sandra heard "gun fire," and the rear driver's side window shattered. Defendant then said, "[n]ow mother f*****, take that." Defendant walked to Slaughter, who was still lying on the ground, and bent over him. Defendant then left. On August 25, 1993, Sandra identified defendant in a lineup.

¶ 14     On cross-examination, Sandra confirmed that on the night of the incident, she described defendant to officers as approximately 165 pounds, 21 years old, and Black. Defendant did not attempt to open the driver's door but reached for Sandra's door, and she was unsure if he touched it.

¶ 15     On redirect examination, Sandra testified that when defendant looked into the rear window, he was slightly bent, and she looked directly at his face. She described defendant as having a medium brown complexion, with hair that had a curl and was "kind of stringy" and fell right above his shoulders.

¶ 16    Morris testified that on March 28, 1993, he was returning to his residence on South Normal in Chicago, when he noticed a "grayish blue" vehicle double parked on the same side of the street as his residence. He drove past the vehicle and parked in front of his residence. As he searched his glove box, the grayish blue vehicle "rolled up" next to him. Defendant, whom he identified in court, exited the passenger side of the vehicle, drew a firearm, opened Morris' door, and said "give me your sh\*\*." Defendant leaned over Morris "looking around for stuff." Morris gave defendant his earring, and defendant also took his wallet. Defendant then said, "lay down or I will pop you." Defendant hit Morris on the side of his head with the firearm, returned to the grayish blue vehicle, and drove off. There was a streetlight approximately 12 feet from the rear of Morris' vehicle, and he looked defendant in the face. When Morris exited his vehicle, he saw defendant's vehicle turn right onto 99th. Morris waited on the corner of 100th Street and Normal, and he observed defendant's vehicle pass his residence and saw defendant in the vehicle. From the time Morris was robbed until he saw the vehicle return, 5 to 10 minutes passed.

¶ 17    On May 7, 1993, Morris viewed a lineup, but he did not identify anyone. On May 24, 1993, officers came to his residence and showed him a photo array. He informed the officers that one of the individuals had the same eyes as the offender but was not the robber. On August 24, 1993, Slaughter came to Morris' residence and showed him a photograph of defendant in a newspaper; Slaughter told Morris that defendant robbed Slaughter. Morris informed Slaughter that defendant was also the individual who robbed Morris. Morris called the police. The next day, officers transported Morris and Slaughter to the police station to view a lineup, and Morris identified defendant as the individual who robbed him.

¶ 18    On cross-examination, Morris testified that on the night of the incident, he described the offender to officers as a Black man between 20 to 25 years old, approximately 5 foot 9 inches tall, and 200 pounds. On redirect examination, Morris stated that he told officers that the offender wore a big, "bluish gray," Georgetown Starter jacket and had bulging eyes, a dark complexion, and long hair.

¶ 19    Dr. Kalelkar, the Cook County deputy chief medical examiner, testified regarding Carlock's autopsy.[6] Dr. Kalelkar found a gunshot wound to the left side of Carlock's forehead and smaller abrasions to the left side of his face that were consistent with flying glass. Dr. Kalelkar opined that Carlock's cause of death was a gunshot wound to his head, and the manner of death was homicide.

¶ 20    Detective Paul Bernatek of the Chicago Police Department testified that on March 28, 1993, he responded to a shooting on West 99th. He observed a large pile of glass, and a vehicle with the rear driver's side window "broken out" and a large amount of blood and matter on the front seat. Bernatek interviewed individuals who were in the vehicle and learned that the offender was a Black male, approximately 6 foot 1 inches tall, and 160 pounds. One witness described the offender as having "large bug eyes." The offender's vehicle was described as a green or gray Chevrolet Caprice Classic. Bernatek also interviewed another man who was robbed a few minutes prior to the shooting.

¶ 21    On cross-examination, Bernatek testified that he documented in his report that he received the description that the offender was 20 to 25 years old. He did not write that anyone stated that the offender had large bug eyes. According to his report, Slaughter described that the offender

_____

[6] Dr. Kalelkar's first name does not appear in the record.

weighed approximately 180 pounds, had brown eyes, and dark hair, but did not describe the shape of the offender's eyes. Slaughter also did not report that he fell to the ground as the offender approached him; rather, Slaughter stated that the offender put him on the ground. Slaughter told Bernatek that the offender attempted to open the driver's door. The offender's vehicle was described as an "'82 Chevy, four-door, green." Bernatek did not list Harden as an eyewitness. Heffner did not state that the offender had long hair. Sandra stated that the offender tried to open the driver's door, but it would not open.

¶ 22    On redirect examination, Bernatek clarified that Sandra described the offender's vehicle as a '83 to '85 green Chevrolet. Slaughter described the offender as 6 foot 1 inches tall, 19 to 21 years old, and 160 to 170 pounds.

¶ 23    Detective Higgins testified that he conducted a follow-up investigation into Carlock's homicide and reinterviewed the witnesses. He learned from another detective that Clifton Smith, who fit the description of the offender given by the witnesses, resided in the area and owned an older model Chevrolet. Higgins and another detective showed Morris a photo array that included Smith, and Morris stated that Smith and the offender had similarities, but Smith was not the offender. Higgins also showed Slaughter the photo array. Slaughter also stated that Smith had similarities to the offender, but he needed to see Smith in person before he could make a positive identification. Harden observed the photo array and did not identify anyone.

¶ 24    In August 1993, Higgins learned that witnesses had seen photographs of defendant. Higgins located defendant and transported him to the police station for a lineup. Sandra, Slaughter, Heffner, and Harden each viewed the lineup and identified defendant as the individual who shot Carlock. Morris identified defendant as the individual who robbed him at gunpoint.

¶ 25 Higgins informed assistant State's attorney (ASA) John King that defendant had been identified, and then King and Ciwick interviewed defendant with defendant's mother present. Higgins and youth officer James Walsh were present for a second interview with defendant after defendant's mother left. King advised defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and the possibility that he could be tried as an adult though he was 16 years old. Defendant then made statements regarding Morris' robbery and Carlock's murder.

¶ 26 On cross-examination, Higgins testified he drafted a supplemental report that did not list Harden as a witness. His notes reflected that Slaughter stated that it appeared that the offender was attempting to open the door before he discharged the firearm. Sandra stated that the offender had Slaughter on the ground. In another supplemental report, Higgins described the offender as 5 foot 6 inches tall and 130 pounds. Defendant did not sign a written statement, and the interview was not recorded. On redirect examination, Higgins stated that defendant declined to give a written or recorded statement.

¶ 27 King testified that on August 26, 1993, he learned that detectives had defendant, whom he identified in court, in custody. On that same day, King met with defendant with Ciwick and defendant's mother present. King advised defendant of his rights, and that although he was a juvenile, his case would not be prosecuted in juvenile court. Defendant stated that he understood. Defendant agreed to give a statement and stated that he "had no involvement with the murder and did not know anything about it." King concluded the interview.

¶ 28 King interviewed defendant again on the same day with Higgins and youth officer Walsh present. King advised defendant of his rights again. During this interview, defendant stated that on March 28, 1993, he was with Tyler when Tyler committed a robbery near 99th and Normal. After

the robbery, Tyler and defendant entered a vehicle, drove around the corner, and parked. Defendant exited the vehicle with a firearm and approached a parked vehicle intending to commit a robbery. Defendant "hit the gun" against the window of the vehicle with his finger on the trigger, and the firearm discharged and struck someone near the eye. Defendant robbed someone outside of the vehicle for a beeper, returned to the vehicle he arrived in, and left. Defendant did not agree to put the statement in writing or have a court reporter take the statement.

¶ 29    On cross-examination, King testified that he advised defendant that he would be prosecuted as an adult. Defendant was not asked if he wanted to put the statement in writing or have a court reporter take it until after he gave the statement. King did not audio tape or video record the conversation and did not write out defendant's statement. On redirect examination, King testified that he did not provide defendant the details to put in his statement.

¶ 30    After the State rested, defense counsel moved for a directed verdict, which the court denied.

¶ 31    Detective Thomas Hoban of the Chicago Police Department testified that he conducted a lineup on May 7, 1993, that Morris viewed in relation to him being robbed, and which potentially related to a homicide. On cross-examination, Hoban testified that Morris did not identify anyone in the lineup, and defendant was not in the lineup.

¶ 32    Joseph Moran, a forensic investigator with the Chicago Crime Laboratory, testified that on March 28, 1993, he was assigned to a homicide on West 99th. At the scene, he examined the exterior of Carlock's vehicle and lifted four ridged fingerprints from the driver's door window, the driver's door handle, next to the handle, and the driver's door window trim. Moran did not conduct any comparisons or evaluations of the prints.

¶ 33    On cross-examination, Moran explained that when a vehicle is outside at night without covering, a coating of water covers the vehicle and "usually blots out the impression that you're trying to remove." Further, humidity "destroys the brush" when someone attempts to put powder on the impression. Moran had weather-related problems that night when collecting fingerprints. Moran also stated that Carlock's vehicle was "well-used," and a vehicle that is not "kept up" causes a high amount of dirt to form, which is detrimental to lifting fingerprints. On redirect examination, Moran testified that the weather did not affect the areas of the vehicle where he lifted the fingerprints.

¶ 34    Officer Richard McGrath, a latent print examiner with the Chicago Police Department, testified that he conducted a visual comparison examination of the lifted fingerprints and defendant's fingerprints and determined that they were not a match. On cross-examination, McGrath testified that only one fingerprint was suitable for comparison.

¶ 35    Arlene Gray, defendant's mother, testified that she went to the police station on August 26, 1993, because defendant was there.[7] When Arlene saw defendant, he was in a room with an officer. A detective eventually entered. She could not recall whether an ASA also entered the room. Arlene was not present the entire time defendant was questioned.

¶ 36    Defendant testified that on August 26, 1993, he was transported to the police station by Ciwick and Higgins. Higgins and another individual questioned defendant about the murder. Defendant told Higgins that he did not know about the murder, and Higgins and the other individual left the room. Higgins returned and escorted defendant to a lineup room. After the lineup, defendant was placed in a room with his mother, an ASA, and Higgins. The ASA informed

---

[7] As Arlene has the same last name as defendant, we will refer to her by her first name.

defendant that though he was 16 years old, he would be charged as an adult. Defendant again stated that he did not know about or commit the murder. Defendant was then placed in another lineup.

¶ 37    When defendant returned to the room, Higgins was present, and a youth officer and an ASA entered later. The ASA again explained defendant's rights and questioned him about the murder. Defendant reiterated that he did not know about the murder. The ASA and youth officer left the room, and Higgins remained. Higgins stated if defendant cooperated, he "could get a lesser charge." Defendant understood that to mean that he would be charged as a juvenile. Higgins also stated that if defendant did not cooperate, he could get "the electric chair or life in jail."

¶ 38    Higgins then began discussing the shooting with defendant. Higgins told defendant that defendant "walked up to the car, tapped on the window, and accidentally the gun went off." Defendant responded, "yeah, that's it; that's what happened." Defendant said this in order to "get a lesser charge." Higgins asked defendant to sign a statement, and defendant agreed. Higgins left and returned with the youth officer and ASA. The ASA explained that Higgins informed him of defendant's statement and asked defendant if the statement was true, and defendant said, "yeah, that's it." Defendant told the ASA that he would sign the statement if the ASA drafted it. The ASA, Higgins, and the youth officer left the room. When the ASA returned and asked defendant if he wanted to sign the statement, defendant refused because "it didn't feel right," as he did not shoot Carlock or see him shot and was not present during the shooting.

¶ 39    On cross-examination, defendant could not recall if Higgins discussed Morris with him. Defendant told Higgins that Tyler committed a robbery on 99th and Normal. Defendant denied giving a statement to the ASA, but asserted the ASA wrote down what Higgins said. Defendant

did not know that he would be charged as an adult. On redirect examination, defendant agreed that he did not want to confess to something that he did not do in exchange for a reduced charge.

¶ 40   The jury found defendant guilty of the first degree murder of Carlock and armed robbery of Slaughter.

¶ 41   Defendant filed a motion for a new trial, which the court denied.

¶ 42   Following a hearing, the court sentenced defendant to concurrent prison terms of 55 years for first degree murder and 30 years for armed robbery.

¶ 43   On direct appeal, defendant argued, *inter alia*, that the identification testimony was insufficient to establish guilt beyond a reasonable doubt. This court affirmed, noting that the "identification testimony was more than sufficient to establish guilt beyond a reasonable doubt." *People v. Gray*, No. 1-95-2932 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 44   This court also rejected defendant's appeals from the denials of his subsequent collateral challenges. See *People v. Gray*, No. 1-99-1885 (1999) (unpublished order under Illinois Supreme Court Rule 23); *People v. Gray*, Nos. 1-10-3169 (2012) and 1-12-0032 (2013) (unpublished summary orders under Illinois Supreme Court Rule 23(c)); *People v. Gray*, 2022 IL App (1st) 162699-U.

¶ 45   On July 9, 2018, defendant filed the instant *pro se* motion for forensic DNA testing of fingerprints pursuant to section 116-3 of the Code.[8] Defendant contended that identity was the sole issue at trial, and chain of custody of the fingerprints was kept and maintained by the Chicago Police Department and State's Attorney's Office. Defendant asserted that the forensic evidence

---

[8] Defendant also requested fingerprint testing and comparison analysis, which the State did not contest and is not an issue in this appeal.

"detract[s] from a finding of guilt," and the results of the testing would provide "materially relevant" information to identify the offender and substantiate defendant's claim of actual innocence. Counsel was appointed and adopted defendant's *pro se* motion.

¶ 46    The State moved to dismiss defendant's motion, contending that the results of the testing would not significantly advance his claim of actual innocence or be reliable, and the procedure used for collection of the prints would have contaminated any DNA on the prints. The State provided an affidavit by Edgardo Jove, a group supervisor at the Forensic Science Center at Chicago, who asserted that any testing would be unreliable because any possible DNA in the fingerprints could potentially be contaminated from brushes and powder being used in different cases and fingerprint examiners not wearing protective masks during the examination process.

¶ 47    In a response, defendant argued that he pled sufficient facts for DNA testing, including that chain of custody remained with the Chicago Police Department, and that Jove's opinion was speculative.

¶ 48    On April 28, 2022, the trial court denied defendant's motion, stating that the requested testing lacked the scientific potential to produce relevant evidence and would not significantly advance defendant's claim of actual innocence.

¶ 49    On appeal, defendant argues that the trial court erred in denying his motion for forensic DNA testing pursuant to section 116-3 of the Code. Defendant asserts that he established a *prima facie* case for forensic DNA testing, and that the results of the testing would materially advance his claim of actual innocence and would be relevant to the "only issue in the case—the identity of the person who shot *** Carlock." The State contends that defendant failed to establish a *prime facie* case for forensic DNA testing because he has not shown a sufficient chain of custody, and

furthermore, the testing would not produce new, noncumulative evidence materially relevant to his assertion of actual innocence.

¶ 50     Section 116-3 of the Code, in relevant part, permits a defendant to move for forensic DNA testing "on evidence that was secured in relation to the trial *** which resulted in his or her conviction," and "was not subject to the testing which is now requested at the time of trial." 725 ILCS 5/116-3(a)(1) (West 2018). To obtain forensic testing, a defendant must first present a *prima facie* case showing that (1) identity was an issue at trial and (2) a proper chain of custody exists and is sufficient to establish that the evidence to be tested "has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b)(1), (b)(2) (West 2018). Identity is an issue when a defendant establishes that at trial his or her identity was in question. *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. "Regarding chain of custody, a defendant may rely on conclusions and presumptions in his or her petition because the evidence sought to be tested will almost surely have been within the State's safekeeping rather than the defendant's." *Id.*

¶ 51     If a *prima facie* case is established, the court must then determine if (1) the result of the testing has the "potential to produce new, noncumulative evidence *** materially relevant to the defendant's assertion of actual innocence" even where the results would not completely exonerate the defendant, and (2) "the testing requested employs a scientific method generally accepted within the relevant scientific community." 725 ILCS 5/116-3(c)(1), (c)(2) (West 2018).

¶ 52     This court reviews *de novo* a trial court's ruling on a motion for forensic DNA testing pursuant to section 116-3 of the Code. *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 49.

¶ 53     Here, neither party disputes that the fingerprints were not subject to DNA testing at the time of trial or that identity was an issue at trial. However, the State contends that defendant failed

to present a *prima facie* case establishing sufficient chain of custody where the fingerprints that defendant requested to be tested for DNA were potentially contaminated by testing and retesting.

¶ 54    The record shows the fingerprints were subjected to latent-print analysis multiple times which, as Jove averred, potentially subjected them to contamination. Thus, it is unknown if any possible DNA revealed would be from the time of the offense or later possible contamination. We will not speculate, however, whether the fingerprints have been so contaminated that they will only yield unreliable results. The State has not cited any authority, nor have we found any, that specifically supports its proposition that possible contamination of DNA evidence during prior testing establishes that the evidence has been "substituted, tampered with, replaced, or altered in any material aspect" to show improper chain of custody and defeat defendant's *prima facie* case under section 116-13 of the Code.

¶ 55    Even assuming, *arguendo*, that defendant established a *prima facie* case for testing, however, defendant failed to establish that the result of the testing has the "potential to produce new, noncumulative evidence materially relevant to *** defendant's assertion of actual innocence."

¶ 56    " 'Materially relevant' " evidence need not exonerate a defendant; rather, it must " 'significantly advance' " his or her assertion of actual innocence. *People v. Stoecker*, 2014 IL 115756, ¶ 33 (quoting *People v. Savory*, 197 Ill.2d 203, 213 (2001)). Whether the result of the testing significantly advances the defendant's assertion of innocence requires the evidence at trial to be evaluated, in addition to the evidence that the defendant seeks to be tested. *Id.*

¶ 57    Here, we do not find that results of the testing would significantly advance defendant's assertion of innocence. Defendant denied that he committed the crime at trial. However, the State

presented several eyewitnesses to the armed robbery and murder, who testified that defendant exited a Chevrolet armed with a firearm and fired it into Carlock's vehicle, killing Carlock. Defendant then robbed Slaughter at gunpoint, taking his beeper. The witnesses positively identified defendant. Furthermore, King and Higgins both testified that defendant admitted to shooting Carlock and robbing Slaughter. Therefore, the evidence at trial, including defendant's admission to King and Higgins, established that defendant committed the offenses. Moreover, this court has already decided that the witnesses' "identification testimony was more than sufficient to establish guilt beyond a reasonable doubt." *Gray*, No. 1-95-2932 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 58    Additionally, if the fingerprints were tested and the DNA matched defendant's, the issue of identity would be resolved unequivocally in the State's favor and defendant's claim of actual innocence would be baseless. If, however, the DNA did not match defendant's, the result would not significantly advance defendant's claim of innocence. Even if someone else's fingerprints were on the door, it would have no bearing on defendant's guilt regarding shooting Carlock through the window or robbing Slaughter at gunpoint. Consequently, the results of the forensic DNA testing of the fingerprints lifted from Carlock's vehicle are not materially relevant to defendant's assertion of innocence. See *People v. Navarro*, 2015 IL App (1st) 131550, ¶ 16 (ballistic testing would be immaterial where multiple eyewitnesses testified and identified the defendant as the shooter).

¶ 59    In sum, defendant failed to establish that the results of forensic DNA testing of the fingerprints would produce materially relevant evidence that would significantly advance his claim of innocence. We therefore affirm the circuit court's denial of defendant's motion for forensic DNA testing.

¶ 60    The judgment of the circuit court of Cook County is affirmed.

¶ 61    Affirmed.