2024 IL App (1st) 221552-U

No. 1-22-1552

Order filed May 2, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 10786 |
| | ) | |
| SANDY WILLIAMS, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE OCASIO III delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's dismissal of defendant's *pro se* motion for DNA testing when he failed to establish that retesting of DNA evidence would provide a reasonable likelihood of more probative results or new, noncumulative evidence materially relevant to his claim of actual innocence.

¶ 2    Defendant Sandy Williams appeals from the circuit court's dismissal of his *pro se* motion seeking additional DNA testing under section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2014)). On appeal, Williams contends that the court erred when

he established a *prima facie* case for retesting and "newly available" and "more sophisticated" testing has the potential to produce new, noncumulative evidence relevant to his claim of actual innocence. We affirm.

¶ 3 The facts of this case have been detailed in our prior orders. We relate only the facts necessary to decide this appeal.

¶ 4 At Williams's bench trial, L.J. testified that she was walking home on the evening of February 10, 2000, when a man grabbed her, told her to give him everything in her pockets, and stated that he had a firearm and would kill her if she screamed. She identified Williams in court as this man. L.J. gave Williams her keys and $100. Williams pushed her toward a beige or tan station wagon, made her sit in the passenger seat, and took her identification and jewelry. Williams then entered the vehicle, forced L.J. into the back seat, and told her to remove her clothes. L.J. complied because Williams choked her. Williams then inserted his penis into L.J.'s vagina. He turned her over and his penis touched her anus but did not enter it. Williams ultimately pushed L.J. from the vehicle, and she ran home.

¶ 5 L.J. told her mother, Ophelia Jackson, what happened, and Jackson called 911. L.J. spoke to a female police officer and was taken to a hospital, where she was examined and her blood was drawn. At the hospital, police officers showed her a person's state identification. L.J. thought it might be the offender but wanted to see the person. When she viewed a man sitting in a police vehicle, she had "some doubts." When the man was removed from the vehicle, she stated that he was not the offender. She reiterated this when she viewed the man at a police station. On April 17, 2001, she identified Williams in a lineup.

¶ 6    During cross-examination, L.J. testified that she described the offender as a black man with dark skin who was taller than her and the vehicle as a tan or beige station wagon.

¶ 7    Jackson testified that she called 911 after L.J. stated that "the man" hurt her. During cross-examination, Jackson agreed that she "[m]ight have" described the man as 5′8″ tall to the 911 operator. She then asserted that she did not recall giving a description to the 911 operator or the police. Jackson denied that L.J. described the offender to her.

¶ 8    Chicago police officer Alvin Crawford testified that after his partner spoke to L.J., he issued a flash message for a dark-skinned "male black, five/eight, black skull cap, black jacket, [and] jeans" in a beige or cream station wagon. During a tour of the area, he came in contact with a man and a vehicle matching the description. L.J. initially identified this man, James McChristine, as the man who assaulted her. When L.J. later viewed McChristine at a police station, she did not identify him as the offender.

¶ 9    Dr. Nancy Shubert, who examined L.J., testified that L.J. stated that she was physically and sexually assaulted. L.J. stated that her vagina was penetrated but denied oral and anal penetration. During the exam, Shubert took swab specimens of a "whitish" pool of secretions that she observed in the "vaginal vault." These specimens and a sample of L.J.'s blood were put in a sexual assault evidence collection kit, which was given to Chicago police detective Michael Baker.

¶ 10    Baker testified that he spoke with L.J. at a hospital. She stated that when she viewed McChristine's photograph, she thought he resembled the offender, but when she viewed him in a police vehicle, she had "considerable doubts." Baker took custody of the sexual assault evidence collection kit, which was sent to the Illinois State Police Crime Lab for testing. When he returned

to a police station with L.J. and had her view McChristine again, she verified that McChristine was not the offender.

¶ 11    Additional testimony established that Williams was arrested on August 3, 2000, in an unrelated case, and that a blood sample was taken while he was in custody.

¶ 12    Forensic scientist Karen Kooi Abbinanti explained that short tandem repeat (STR) DNA analysis was generally accepted in the scientific community and one of the most modern types of analysis. STR analysis examined up to 14 locations (loci) of the DNA to generate a DNA profile for comparison. After receiving Williams's blood standard, Abbinanti used this method to extract a male DNA profile which she entered into a database at the Illinois State Police Crime Lab. This database was used to compare DNA profiles to samples from unsolved cases.

¶ 13    Forensic biologist Brian Hapack testified that L.J.'s vaginal swabs tested positive for semen.

¶ 14    Sandra Lambatos testified that she previously worked at the Illinois State Police Crime Lab as a forensic scientist and that her duties included examining evidence for the presences of bodily fluids and conducting DNA comparisons. She explained that polymerase chain reaction (PCR) was the type of DNA test performed by the Illinois State Police Crime Lab, and that some evidence samples were sent to Cellmark Diagnostic Laboratory (Cellmark) to reduce backlog.

¶ 15    L.J.'s vaginal swabs and blood standard were sent to Cellmark for analysis. A computer database generated a match between the male DNA profile found in the semen from L.J.'s vaginal swabs and the male DNA profile that was identified as originating from Williams. Lambatos then compared the semen that Hapack identified in L.J.'s vaginal swabs to the male DNA profile that was identified in Williams's blood sample and concluded that Williams could not be excluded as

a possible source of the semen. In other words, the semen identified in the vaginal swabs was consistent with having originated from Williams, and the probability of this profile occurring in the general population would be 1 in 8.7 quadrillion black, 1 in 390 quadrillion white, or 1 in 109 quadrillion Hispanic unrelated individuals. She therefore opined that this was a match to Williams.

¶ 16    During cross-examination, Lambatos testified that she reviewed Cellmark's data and then made her own determinations. The DNA profile generated was based on an examination of 13 locations plus a sex marker. She entered the "deduced male profile" identified in the Cellmark report into the database search.

¶ 17    Lambatos further testified that a "differential extraction" was performed on the vaginal swabs to separate the "female scanner epithelial cells" from possible sperm cells and that the results indicated a mixture of two people. Lambatos explained that there was "some background noise" because there was "so much DNA" and the instrumentation was only "so sensitive." However, the "power" of DNA came from "all 13 areas" which provided "uniqueness." She further testified that the mixture from the vaginal swabs contained evidence of two people, and Williams fit one of the possibilities.

¶ 18    During redirect, Lambatos reiterated that the two people in the mixture were Williams and L.J. The fact that the mixture contained material from L.J. and Williams did not affect her conclusion, and in her opinion the DNA on the vaginal swabs came from L.J. and Williams.

¶ 19    Chicago police detective Robert McVicker testified that he was assigned to L.J.'s case. On March 15, 2001, he was notified of a DNA match and obtained a photograph of Williams. After learning that Williams was in custody, McVicker arranged a lineup. On April 17, 2001, L.J. identified Williams as the person who attacked and sexually assaulted her.

¶ 20    The trial court found defendant guilty of two counts of aggravated criminal sexual assault, one count of aggravated kidnapping, and one count of aggravated robbery. Williams was sentenced to two concurrent terms of natural life in prison for aggravated criminal sexual assault and a consecutive extended-term sentence of 60 years for aggravated kidnapping. The trial court also imposed a concurrent 15-year sentence for aggravated robbery.

¶ 21    On appeal, this court modified Williams's sentences to run concurrently, while affirming the circuit court in all other aspects. See *People v. Williams*, 385 Ill. App. 3d 359 (2008). Our supreme court reinstated Williams's consecutive sentences. See *People v. Williams*, 238 Ill. 2d 125 (2010), *aff'd*, *Williams v. Illinois*, 567 U.S. 50 (2012). Williams then filed an unsuccessful collateral attack on his convictions. See *People v. Williams*, 2015 IL App (1st) 131359.

¶ 22    On November 20, 2014, Williams filed a *pro se* motion for forensic testing pursuant to section 116-3 of the Code, requesting new DNA testing of the semen stain on the vaginal swabs in this case because "more probative methods of testing" currently existed. The motion identified mitochondrial DNA and Y-SRT testing, as well as "next generation kits" including the "Power Plex 16 System and Identifier" and the "InterFiler Direct PCR Amplification Kit," which provided "more refined" results. The motion concluded that new testing could provide new, noncumulative, and material evidence of Williams's actual innocence.

¶ 23    Attached to the motion was a 2001 "Report of Laboratory Examination" from Cellmark, which indicated that DNA testing using the PCR, the AmpFISTR Profiler Plus, and the AmpFISTR COfiler Amplification Kits was performed on the vaginal swabs and blood standard in this case.

¶ 24    On January 21, 2015, the circuit court appointed counsel. On June 6, 2017, the State filed a motion to dismiss. Williams filed a reply alleging, in pertinent part, it would be a "worthwhile

endeavor" to retest the DNA evidence with the test currently used by the Illinois State Police, which examined 23 loci plus the sex marker.

¶ 25    On September 21, 2022, the trial court held argument on the State's motion. The parties agreed that although the *pro se* motion sought mitochondrial DNA testing, that test would not be appropriate in this case.

¶ 26    Williams's counsel then stated that, while the *pro se* motion also sought Y-STR testing, that test would not be useful until after STR testing was performed with the "new software kits." Counsel then argued that "advanced DNA technology" was akin to new testing, noting that the "Fusion" test, for example, tested "nearly double" the number of genetic markers as prior tests. Counsel acknowledged that Williams's genetic code was found by the original test but asserted that testing additional markers would result in either more evidence against Williams or a "whole new ball game." Moreover, the new tests might resolve the "white noise" in the sample discussed at trial.

¶ 27    The State responded that the issue was whether the court believed that the expanded kits were new, noting that while these kits tested 23 loci, the technology and the STR testing itself were the same. The trial court granted the State's motion noting, relevant here, that the expanded kits were not "new."

¶ 28    On appeal, Williams contends the trial court erred in denying his motion for additional DNA testing pursuant to section 116-3 of the Code. He asserts that identity was an issue at trial; the evidence to be tested was previously tested, admitted at trial, and subject to a sufficient chain of custody; and more sophisticated testing has the potential to produce new evidence relevant to his claim of actual innocence.

¶ 29    Pursuant to section 116-3, a defendant may request forensic DNA testing "on evidence that was secured in relation to [his] trial or guilty plea." 725 ILCS 5/116-3(a) (West 2014). To be entitled to testing, the defendant must make a *prima facie* case by demonstrating that (1) identity was at issue in the trial and (2) the evidence to be tested "has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." 725 ILCS 5/116-3(b) (West 2014). When, as here, the evidence has already been tested, the defendant must also show that the evidence "can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116-3(a)(2) (West 2014).

¶ 30    Identity is at issue if the identity of the offender is disputed or in question. *People v. Cocroft*, 2020 IL App (1st) 180056, ¶ 21. Additionally, a defendant may rely on presumptions and conclusory assertions regarding chain of custody "because the evidence sought to be tested will almost surely have been within the State's safekeeping rather than the defendant's." *Id.*

¶ 31    If the defendant presents a *prima facie* case, the circuit court shall allow the requested testing upon a determination that (1) "the result of the testing has the scientific potential to produce new, noncumulative evidence" that is "materially relevant to the defendant's assertion of actual innocence when the defendant's conviction was the result of a trial, even though the results may not completely exonerate the defendant," and (2) the requested testing "employs a scientific method generally accepted within the relevant scientific community." See 725 ILCS 5/116-3(c) (West 2014).

¶ 32    The proposed testing need not completely exonerate the defendant to meet this standard. 725 ILCS 5/116-3(c)(1) (West 2014). However, it must " 'significantly advance' " a claim of actual

innocence. *People v. Stoecker*, 2014 IL 115756, ¶ 33 (quoting *People v. Savory*, 197 Ill. 2d 203, 214 (2001)). Whether this standard has been satisfied rests on an evaluation of the evidence presented at trial as well as the evidence a defendant seeks to test. *Id.* "However, the strength of the State's evidence is not a hurdle that the defendant must overcome to meet the requirements of the statute." *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 11.

¶ 33 The well-pleaded facts in a section 116-3 motion are accepted as true and construed liberally unless contradicted by the record. *Cocroft*, 2020 IL App (1st) 180056, ¶ 21. Our review is *de novo*. *Stoecker*, 2014 IL 115756, ¶ 21.

¶ 34 In the case at bar, the State concedes that identity was an issue at trial and that the evidence to be tested was subject to a secure chain of custody and admitted at Williams's trial. However, the State argues that Williams has failed to meet the requirements of section 116-3(a)(2) of the Code to show that the requested testing uses "a method that was not scientifically available at the time of trial." See 725 ILCS 5/116-3(a)(2) (West 2014).

¶ 35 The State agrees that Fusion, a testing kit currently used by the Illinois State Police, examines 23 loci. However, the State asserts that this test is an "incremental" improvement of the PCR test that was originally used in this case. The State further argues that there is no reasonable likelihood that retesting the DNA evidence pursuant to the same method, but using an analysis of 23 loci rather than 13, would provide "more probative results" as required by section 116-3(a)(2) in light of the "staggering" statistical match testified to at trial.

¶ 36 Here, because the evidence at issue was tested prior to trial, Williams bears the burden to establish that the testing he now requests was "not scientifically available at the time of trial." See 725 ILCS 5/116-3(a)(2) (West 2014). This court has previously determined that a defendant's

burden to show that the requested testing was not scientifically available at the time of trial or when earlier testing took place "is not whether the lab that tested the evidence had fully implemented that particular test but whether the test was " '*not scientifically available.*' " (Emphasis in original.) See *Rozo*, 2012 IL App (2d) 100308, ¶ 10 (quoting 725 ILCS 5/116-3(a)(2) (West 2008)).

¶ 37    Here, Williams has failed to meet his burden under section 116-3(a)(2) to establish that the requested testing was not scientifically available at the time of trial. The record reveals that the vaginal swab was tested using the PCR, the AmpFISTR Profiler Plus, and the AmpFISTR COfiler Amplification Kits, and that a DNA match was generated using 13 loci and a sex identifier. Although Williams has identified several, in his words, "more precise" tests, which analyze additional loci, he does not identify a new form of testing the DNA itself. Rather, he concludes that these expanded kits, which provide a "more robust genetic profile," constitute a "new scientific methodology." However, the additional testing that Williams requests appears to be merely a more detailed version of the PCR test, which was scientifically available at the time of his trial and, as Lambatos testified, was used on the DNA evidence in this case. As stated, the standard is not whether the lab used a certain test but whether the testing method itself was scientifically available. *Id.*

¶ 38    Accordingly, Williams has failed to establish that the requested testing was not scientifically available at the time of trial, and he therefore cannot satisfy the statutory requirements of section 116-3(a)(2).

¶ 39    Moreover, even if Williams were able to satisfy section 116-3(a)(2), he has not met his burden under section 116-3(c) to establish that retesting of the DNA evidence has the scientific

potential to produce new, noncumulative evidence materially relevant to his claim of actual innocence. See 725 ILCS 5/116-3(c) (West 2014).

¶ 40    Evidence that is " 'materially relevant' to a claim of actual innocence is simply evidence which tends to significantly advance that claim." *Savory*, 197 Ill. 2d at 213. To determine whether evidence is materially relevant "requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test." *Id*. at 214.

¶ 41    At trial, L.J. identified Williams as the man who forced her into a vehicle, choked her, inserted his penis into her vagina, touched her anus with his penis, and took her property. The testimony of several forensic scientists established that testing on the DNA obtained from the semen on L.J.'s vaginal swab matched the DNA profile extracted from Williams's blood standard.

¶ 42    Specifically, Lambatos testified that after a computer database found a match between the DNA profile in the vaginal swabs and Williams's DNA profile, she compared the semen identified in the vaginal swabs to the male DNA profile identified in Williams's blood sample and concluded that Williams could not be excluded as a possible source of that semen. Lambatos agreed that the test used in this case examined 13 loci plus a sex marker and that there was unidentified background noise. However, Lambatos asserted that the semen identified in the vaginal swabs was consistent with having originated from Williams and that the probability of this profile occurring in the general population would be 1 in 8.7 quadrillion black, 1 in 390 quadrillion white, or 1 in 109 quadrillion Hispanic unrelated individuals.

¶ 43    Williams asserts that L.J.'s initial identification of McChristine as the offender casts doubt on her credibility, her identification of Williams, and the strength of the State's case. However, given the statistical match testified to at trial, any additional DNA test on the vaginal swabs would

likely not significantly advance his claim of actual innocence. See *Stoecker*, 2014 IL 115756, ¶ 34 (holding additional testing would likely not exonerate the defendant where "the profile generated by \*\*\* test results would be expected to occur in 1 in approximately 1.1 trillion Caucasians").

¶ 44    Nonetheless, Williams contends that new kits, which examine more loci than the 13 loci examined in the original test, would provide more accurate results. While that may be true, Williams has not established that the original testing was inaccurate or flawed. Rather, he argues that the facts that the testing was performed at Cellmark rather than the Illinois State Police Crime Lab, and that Lambatos was unaware of Cellmark's testing and equipment procedures and did not personally test the vaginal swabs, lent "uncertainty" to her conclusions at trial. Although Williams further asserts that additional testing could eliminate the "background noise," he does not explain how additional testing would exclude him from the 13-loci match. See *id.* ¶ 35 (quoting *People v. Stoecker*, 2013 IL App (3d) 110300-U, ¶ 37 (Lytton, J. dissenting) (" 'Without having indicated some inaccuracy in the original testing, the results of the Y-STR testing should be the same as the results of the PCR testing; those results indicated that defendant could be included as a possible contributor to the semen stain found on the victim's pants.' ")).

¶ 45    Accordingly, Williams has failed to show that additional testing would significantly advance his claim of actual innocence given the great statistical likelihood that his DNA was present on the vaginal swab, as already established by a test that examined 13 loci. Thus, he has failed to meet his burden to establish that retesting the vaginal swab has the "scientific potential to produce new, noncumulative evidence" that is materially relevant to his claim of actual innocence under section 116-3(c) of the Code. See 725 ILCS 5/116-3(c) (West 2014). We therefore affirm the circuit court's grant of the State's motion to dismiss Williams's section 116-3 motion.

¶ 46     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47     Affirmed.